# Exhibit C

(State Court Summons and Complaint)

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

| | |
|---|---|
| **STATE OF SOUTH CAROLINA** | ) |
| | ) |
| **COUNTY OF YORK** | ) |
| | ) |
| **BRANDON GUFFEY, INDIVIDUALLY** | ) |
| **AND AS PERSONAL REPRESENTATIVE** | ) |
| **FOR THE ESTATE OF G.T.G.,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| **META PLATFORMS, INC.;** | ) |
| **INSTAGRAM, LLC;** | ) |
| **META PAYMENTS, INC.; and** | ) |
| **META PLATFORMS TECHNOLOGIES,** | ) |
| **LLC,** | ) |
| Defendants. | ) |

**SUMMONS**
**(Jury Trial Demanded)**

TO DEFENDANTS ABOVE NAMED:

YOU ARE HEREBY SUMMONED and required to answer the Complaint herein, a copy of which is herewith served upon you, and to serve a copy of your answer to this complaint upon the subscriber, at the address below, within thirty (30) days after service hereof, exclusive of the day of such service. You are hereby notified that if you fail to answer the complaint with the prescribed time, judgment by default will be rendered against you for the relief demanded in the Complaint.

STROM LAW FIRM, LLC

s/ John R. Alphin
John R. Alphin, (S.C. Bar No. 72583)
Jessica L. Fickling, (S.C. Bar No. 11403)
Kennedy Ezekiel, (S.C. Bar No. 106318)
6923 N. Trenholm Road, Ste 200
Columbia South Carolina, 29206
TEL: (803) 252-4800
FAC: (803) 252-4801
jfickling@stromlaw.com
jalphin@stromlaw.com
kezekiel@stromlaw.com

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

| | |
|---|---|
| **STATE OF SOUTH CAROLINA** ) | |
| ) | |
| **COUNTY OF YORK** ) | |
| ) | |
| **BRANDON GUFFEY, INDIVIDUALLY** ) | |
| **AND AS PERSONAL REPRESENTATIVE** ) | |
| **FOR THE ESTATE OF G.T.G.,** ) | |
| ) | **COMPLAINT** |
| **Plaintiff,** ) | **(Jury Trial Demanded)** |
| ) | |
| ) | |
| **v.** ) | |
| ) | |
| **META PLATFORMS, INC.;** ) | |
| **INSTAGRAM, LLC;** ) | |
| **META PAYMENTS, INC.; and** ) | |
| **META PLATFORMS TECHNOLOGIES,** ) | |
| **LLC,** ) | |
| **Defendants.** ) | |
| ) | |

COMES NOW, Brandon Guffey, Individually and as Personal Representative for the Estate of G.T.G., by and through his undersigned Counsel of Records and files this Complaint against Defendants Meta Platforms, Inc., Instagram, LLC, Meta Payments, Inc. and Meta Platforms Technologies, LLC. Mr. Guffey alleges as follows:

## I.   <u>INTRODUCTION</u>

1. This matter arises from Defendant Meta Platforms, Inc. ("Meta") addictive and dangerous social media products marketed using deceitful practices. The social media giant, Meta, originally incorporated in Delaware as "The Facebook, Inc.," became "Facebook, Inc." and in 2021 Meta Platforms, Inc. Meta is a multinational technology conglomerate which owns and operates Facebook, Instagram, Threads, WhatsApp and other products and services under one company name. Therefore, when "Meta" is referred to it will encompass the various subsidiaries and predecessors.

2.      Since Meta's genesis in 2004, it has grown into the dominant social media platform bringing in $116,61 billion[1] in 2022 alone. Meta's primary source of revenue is selling advertising space on its various platforms. In an effort to increase advertising sales, Meta conducted studies to find the most vulnerable easily addicted target population. These studies "borrowed heavily from the behavioral and neurobiological techniques used by slot machines and exploited by the cigarette industry, Defendants deliberately embedded in their products an array of design features aimed at maximizing youth engagement to drive advertising revenue."[2] Despite knowing the impact its products would have on America's youth Meta still chose to target them in pursuit of profit. For these reasons, Meta is responsible for the unprecedented mental health crisis in America today.

3.      Defendants' products exploit adolescents through: (1) an "algorithmically-generated, endless feed to keep [the user] scrolling in an induced "flow state", (2) intermittent variable rewards" that manipulate dopamine delivery to intensify use, (3) "trophies" to reward extreme usage, (4) metrics and graphics to exploit social comparison, (5) incessant notifications that encourage repetitive account checking by manufacturing insecurity, (6) inadequate, essentially illusory age verification protocols, (7) and deficient tools for parents that create the illusion of control."[3]

4.      Unbeknownst to users, Meta's platforms have infiltrated almost every aspect of their lives. Without any nefarious indicators, adult users have allowed their children to join the social media platforms unaware of the harmful impacts. A group of adolescents was surveyed and when asked, over one third of 13-to 17-year- old's report unrelenting thoughts about their activity on one of Meta's platforms. They also struggle to cut back on their usage, even though they

---

[1] Meta. "Meta Reports Fourth Quarter and Full Year 2022 Results," Page 1. https://s21.q4cdn.com/399680738/files/doc_financials/2022/q4/Meta-12.31.2022-Exhibit-99.1-FINAL.pdf
[2] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury))
[3] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury))

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

acknowledge it is too much. Comparable to money in a slot machine, kids are giving their own form of currency, attention, time, and data. Defendants caused "millions of young people [to] struggl[e] with bullying, violence, trauma and mental health" and "[w]e must hold social-media companies accountable" for their role in this crisis.[4]

5.     President Biden has even acknowledged the concerning amount of data collected on Americans every day[5] and the need to hold social media platforms accountable for the experiment they are conducting on our children for profit everyday."[6]

6.     To collect data, Meta uses an online marketing strategy called microtargeting. Microtargeting refers to data collection and analysis, which allows advertisers to micro-target specific groups of users. After collecting personal information on users, a profile for the user is created based on their characteristics. These users are then further divided into categorized lists which advertisers can directly customize ads. Microtargeting is controversial because Meta mines users' personal data and sells it to advertisers. Furthermore, most of the users are unaware Meta is recording and storing their personal information. For example, when you watch a video on Instagram algorithms have been designed to monitor your activity and store this information. Basically, Meta monitors how long a user watches an ad, if they click on the ad, if they keep

---

[4] See Haugen_00016373 at Haugen_00016379 (internal Meta report from March 2020 summarizing internal research on "problematic use"—when a user "experienc[es] both of the following issues 'very often' or 'all the time': Lack of control or feelings of guilt over Facebook use. Negative impact in at least one of the following areas: productivity, sleep, parenting, or relationships."); Haugen_00016373 at Haugen_00016412, Haugen_00016490 (referring to "problematic use" as "Loss of Control Over Time Spent" or "LCOTS"); Haugen_00016373 at Haugen_00016379 (recognizing that "Problematic Use" is "sometimes referred to as 'social media addiction' externally").
[5] Joe Biden, Republicans and Democrats, Unite Against Big Tech Abuses, Wall St. J. (Jan. 11, 2023), https://www.wsj.com/articles/unite-against-big-tech-abuses-social-media-privacy-competition-antitrust-children-algorithm-11673439411. ("Big Tech companies collect huge amounts of data on the things we buy, on the websites we visit, on the places we go and, most troubling of all, on our children.")
[6] The White House, President Biden's State of the Union Address (Mar. 1, 2022), https://www.whitehouse.gov/state-of-the-union-2022/; see also The White House, President Biden's State of the Union Address (Feb. 7, 2023), https://www.whitehouse.gov/state-of-theunion-2023/.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

scrolling, and uses this information to show more content which keeps the user coming back for more.

7.    Defendants designed the algorithms to be addictive to a vulnerable segment of the population, children. Defendants then concealed the research showing the harmful effects their products had on adolescents. Meta's lack of transparency regarding their targeting practices is deceitful and has brought much pain and suffering.

8.    Throughout the 21st century, adolescents have experienced unprecedented mental health problems. In response to inquiries regarding Meta's potential role in the mental health crisis, Meta conducted internal studies analyzing their designs, products, and algorithms and the potential effects they could have on adolescents' mental health. These studies revealed Meta's algorithms negatively affected the mental health of minors. However, when later questioned, Meta adamantly denied there was a correlation between their product and the mental health crisis. Meta knew their products were not safe and intentionally misinformed the public.

9.    Suicide rates for youth are up 57% from the previous year. Emergency room visits for anxiety disorders are up 117%. Between 2010 and 2020, the years Meta was honing their addictive algorithms, high schools saw a 40% increase in students with persistent sadness and hopelessness and 36% of those students had attempted to take their own lives. Families and friends across the country are suffering every day from the senseless loss of their loved ones.

10.    There is scientific research to support the correlation between Defendants' conscious, intentional design choices and the youth mental health crisis. Kids are unable to separate the virtual world from reality, giving social media platforms control over the child's version of reality. Relational intimacy is a fundamental human need found through in person interaction with others. When a screen replaces in person interactions, adolescents become

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

disconnected and disassociated. During this stage of life, the brain is at the height of its plasticity. Therefore, it can be detrimental to not receive the necessary human interactions which form emotional regulation as adults.

11.     Meta conducted extensive internal studies (previously concealed) establishing its knowledge of the defective and addictive products and the impacts these products would have on adolescents. Nevertheless, in order to capitalize on their platforms, Meta continued exploiting users by implementing defective algorithms – in foreseeably unsafe ways and in dereliction of their basic duties of care- targeting young people, inducing harmful, unhealthy, and compulsive use by kids.

12.     In late 2021, the U.S. Surgeon General issued an advisory, reserved only for urgent health issues, to inform the nation of the mental health crisis amongst youth. The surgeon general acknowledged the dangerous designs in Defendants' platforms and Defendants' abdication of responsibility for the resulting harms:

> In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways . . . .
> [T]echnology companies must step up and take responsibility for creating a safe digital environment for children and youth. Today, most companies are not transparent about the impact of their products, which prevents parents and young people from making informed decisions and researchers from identifying problems and solutions.[7]

13.     The U.S. Surgeon general explained it like this: "You have some of the best designers and developers in the world who have designed these platforms to make sure people are maximizing the amount of time they spend on these platforms. And if we tell a child, use the force

---

[7] U.S. Surgeon General's Advisory, Protecting Youth Mental Health (Dec. 7, 2021), https://www.hhs.gov/sites/default/files/surgeon-general-youth-mental-health-advisory.pdf (emphasis in original).

of your willpower to control how much time you're spending, you're pitting a child against the world's greatest product designers."[8]

14.     Psychiatrist, Dr. Adriana Stacey, explains that social media releases a "dopamine dump" in the brain, similar to other addictive activities like using cocaine. This dopamine dump tells the brain to keep using that product. Teenagers are especially vulnerable because their brain is hyperactive in the region affected compared to adults. This results in the inability to get motivated to do anything else but scroll through social media.[9]

15.     A study published in JAMA Pediatrics suggested habitual social media checking altered the brain chemistry of adolescents, displaying greater neural sensitivity in those habitually checking social media.[10] Changes in neural sensitivity has been linked to Social Anxiety Disorder.

16.     Studies have also shown that "excessive screen time was significantly associated with poorer emerging literacy skills and ability to use expressive language."[11]

17.     Plaintiff has experienced the detrimental effects of social media firsthand, through the sextortion and resulting suicide of his teenage son. While nothing will fully remedy this wrong, Plaintiff brings this action to prevent the continuance of Defendants' wrongful conduct. Plaintiff brings this action to hold Defendants accountable for their role in the mental health crisis in adolescents.

## II.    JURISDICTION AND VENUE

---

[8] Allison Gordon & Pamela Brown, Surgeon General says 13 is 'too early' to join social media, CNN (Jan. 29, 2023), https://www.cnn.com/2023/01/29/health/surgeon-general-social-media/index.html. Exhibits and referenced materials are incorporated in this Master Complaint as if fully stated herein.
[9] Allison Gordon & Pamela Brown, Surgeon General says 13 is 'too early' to join social media, CNN (Jan. 29, 2023), https://www.cnn.com/2023/01/29/health/surgeon-general-social-media/index.html. Exhibits and referenced materials are incorporated in this Master Complaint as if fully stated herein.
[10] Allison Gordon & Pamela Brown, Surgeon General says 13 is 'too early' to join social media, CNN (Jan. 29, 2023), https://www.cnn.com/2023/01/29/health/surgeon-general-social-media/index.html. Exhibits and referenced materials are incorporated in this Master Complaint as if fully stated herein.
[11] *Id.*

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

18.     This Court has subject-matter jurisdiction.

19.     At all times relevant to this complaint, Plaintiff resided in York County, South Carolina.

20.     At all times relevant to this complaint, Defendant Meta has been a for-profit entity organized under the laws of Delaware with its principal place of business in California.

21.     This Court has personal jurisdiction as the Defendants do business in the State of South Carolina and had sufficient minimum contacts with the State. Defendants intentionally avail themselves of the markets in the State of South Carolina through the promotion, marketing, and operations of their platforms at issue in this lawsuit in South Carolina, and by retaining the profits and proceeds from these activities, to render the exercise of jurisdiction by this Court permissible under South Carolina law and the United States Constitution.

22.     Venue is proper as a substantial part of the events or omissions complained of occurred within York County, South Carolina.

## III.     PARTIES

### A.     Plaintiff

23.     Plaintiff Brandon Guffey is an individual residing in York County, South Carolina, and the personal representative of the Estate of G.T.G., his deceased 17-year-old son. Plaintiff brings this suit on behalf of himself and on behalf of G.T.G.

### B.     Defendant Meta Platforms, Inc.

24.     Meta is a Delaware corporation, having its principal place of business in California.

25.     Meta Platforms' subsidiaries include, but may not be limited to, the entities identified in this section, as well as a dozen others whose identity or involvement is presently unclear.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

## C. **Subsidiary Defendants**

26.     Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California.

27.     Facebook Operations, LLC ("Facebook 2") is a wholly owned subsidiary of Meta Platforms that was incorporated in Delaware on January 8, 2012. Facebook 2 is likely a managing entity for Meta Platforms' other subsidiaries. Meta Platforms is the sole member of this LLC, whose principal place of business is in Menlo Park, CA.

28.     Facebook Payments, Inc. ("Facebook 3") is a wholly owned subsidiary of Meta Platforms that was incorporated in Florida on December 10, 2010. Facebook 1 manages, secures, and processes payments made through Meta Platforms, among other activities. Its principal place of business is in Menlo Park, CA.

29.     Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms.

30.     Instagram, LLC ("Instagram") launched an app called Instagram in October 2010. On or around April 7, 2012, Meta Platforms purchased Instagram, LLC for over one billion dollars and reincorporated the company in Delaware. Meta Platforms is the sole member of this LLC, whose principal place of business is in Menlo Park, CA.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

31.     Siculus, Inc., ("Siculus") is a wholly owned subsidiary of Meta Platforms that was incorporated in Delaware on October 19, 2011. Siculus constructs data facilities to support Meta Platforms' platforms. Its principal place of business is in Menlo Park, CA.

32.     Meta owns, operates, controls, produces, designs, maintains, manages, develops, tests, labels, markets, advertises, promotes, supplies, and distributes digital platforms available through mobile- and web-based applications ("apps"), including Instagram and Facebook (together, "Meta platforms"); Messenger; and Messenger Kids. Meta's apps and devices are widely distributed to consumers throughout the United States.

## IV.   GENERAL FACTUAL ALLEGATIONS

### A.  Defendants Targeted Children with Addictive Algorithms

33.     Defendants have intentionally designed, engineered, marketed, and operated its products to be addictive to adolescents. Defendants' main source of revenue is adolescent users. They have more time on their hands and are more easily addicted. Defendants figured out if they created algorithms to make adolescents addicted to their platforms, adolescents would in turn use the platforms compulsively and this would generate more ad revenue for Defendants. Moreover, because adolescents are using the platforms more than other users Defendants are able to generate more data about their preferences, habits, and behaviors. Specifically, "Defendants mine and commodify that data, including by selling to advertisers the ability to reach incredibly narrow tranches of the population, including children. Each Defendant placed its app(s) into the stream of commerce and generated revenues through the distribution of those apps at the expense of the consuming public and Plaintiffs."[12] Defendants designed their algorithms to exploit minor users'

---

[12] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

incomplete brain development knowing the dangers they were exposing the children to and knowing they did not have in place protections for these adolescent users.

34.     In 1999 Congress enacted the Children's Online Privacy Protection Act ("COPPA"). COPPA protects children under 13 years of age by regulating how Defendants can collect, use, or disclose, their personal information. COPPA applies to apps and websites that are targeting children or known to be used by children under 13. These protections were put in place because Congress recognized the vulnerability of children in the Internet Age. A 1998 FTC report observed, "[t]he immediacy and ease with which personal information can be collected from children online, combined with the limited capacity of children to understand fully the potentially serious safety and privacy implications of providing that information, have created deep concerns about current information practices involving children online."[13] There are significant safety concerns when the social media platforms prompt children to disclose personal information without requiring prior consent of their parents. By allowing children to act without their parents' permission, the child is given a false conception they are mature enough to decide when it is appropriate to disclose personal information. The platforms claim to conduct age verification and authentication, but only require the user to self-report their age. This system is wholly inadequate and makes it easy for children and predators to create accounts with inaccurate ages.

35.     This is conspicuously reprehensible for two reasons. First, Defendants have been aware of the problem since 2011 if not before.[14] Second, Defendants have available to them

---

[13] Privacy Online: A Report to Congress, Federal Trade Commission (1998) at 13. https://www.ftc.gov/sites/default/files/documents/reports/privacy-online-report-congress/priv- 23a.pdf. ; *See also*, META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).
[14] Emily Bazelon, Why Facebook is After Your Kids, N.Y. Times (Oct. 12, 2011), https://www.nytimes.com/2011/10/16/magazine/why-facebook-is-after-your-kids.html (Reporting the "troubling news" that 7.5 million children under 13 were on Facebook.)

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

methods to prevent children under thirteen from accessing their products, but they chose not to implement protections because children are a financially lucrative market.

36.    Meta understands that its platforms are used by kids under 13: "there are definitely kids this age on IG [Instagram] . . . they aren't supposed to be on IG at all."[15] It understands that its platforms are addictive: "(1) teens feel addicted to IG and feel a pressure to be present, (2) like addicts, they feel that they are unable to stop themselves from being on IG, and (3) the tools we currently have aren't effective at limiting their time on the ap (sic)."[16] It understands that addictive use leads to problems: "it just keeps people coming back even when it stops being good for them." [17] And it understands that these problems can be so extreme as to include encounters between adults and minors—with such "sex-talk" 32x more prevalent on Instagram than on Facebook[18] and driven largely by a single defect.[19]

### B. Adolescents are Vulnerable and Susceptible to this Harm

37.    In September of 2021, one of Meta's internal studies was leaked by *The Wall Street Journal.* It revealed Meta knew the app was harmful to teens. Among the top concerns included worsening body image for 1 in 3 girls.[20] Adolescence is a time when the brain is still developing how to evaluate risk, regulate emotion, and control impulses. For the same reasons, youth are not allowed to vote, drink alcohol, or engage in other activities, because it is well known and appreciated that the brain is not fully developed. The plasticity of the brain is its ability to change and create new neural pathways. One of the most pliable times in one's life is during adolescence.

---

[15] META3047MDL-003-00123666.
[16] META3047MDL-003-00157036.
[17] META3047MDL-003-00011760 at META3047MDL-003-00011761.
[18] META3047MDL-003-00119838.
[19] Id.
[20] https://www.apa.org/monitor/2022/03/feature-minimize-instagram-effects

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

Due to the plasticity of the brain during this time in someone's life, they are also especially vulnerable to adverse influences, like addiction.

38.     Social media app designers use psychological vulnerabilities and unconscious biases of people's minds to influence what people do without the person even realizing it.[21] Essentially several billion people are carrying around a slot machine in their pocket. [22]

39.     Technology also hijacks users' minds through exploiting their need for social approval. Every time we receive a notification indicating a like, comment, or tag by a friend our social approval sense of belonging is triggered. Social media platforms, like Facebook, control who is shown our posts, who it recommends to be tagged, how long and what hierarchy our post should be in others feeds. Unfortunately, for some demographics this social approval is powerful to their identity.

40.     The demographic most vulnerable to this need for social approval are teenagers. The reason Defendants' apps have created such an impact on teenager's brains are because the prefrontal cortex of the brain, which controls planning and executive decisions, like risk and reward, is not fully developed in children and adolescents.[23] In fact, this is one of the last regions to develop in the brain.

41.     The prefrontal cortex enables us to regulate impulses and responses to social rewards. As adults with fully developed prefrontal cortexes the average individual can still fall prey to the tactics of social media reward systems, but as a child it is virtually impossible to not fall prey.

---

[21] Von Tristan Harris, The Slot Machine in Your Pocket, Spiegel Int'l (July 27, 2016), https://www.spiegel.de/international/zeitgeist/smartphone-addiction-is-part-of-the-design-a- 1104237.html.
[22] Id.
[23] Nino Gugushvili et al., Facebook use intensity and depressive symptoms: a moderated mediation model of problematic Facebook use, age, neuroticism, and extraversion at 3, BMC Psych. 10, 279 (2022), https://doi.org/10.1186/s40359-022-00990-7.

42.     When the brain is in the developmental phase, it seeks out stimuli that result in a reward indication and cause dopamine to flood the brain's reward pathways. Defendants used this to their advantage by creating a reward system within Instagram. The social media platform Instagram is the stimuli, the 'likes' on posts are the reward that cause dopamine to flood the brain. Every time a user receives a like, the associations between the stimulus and reward become stronger.[24]

43.     Adam Alter, New York Professor and social psychologist, explains the difference in drinking alcohol and smoking cigarettes: "[t]he minute you take a drug, drink alcohol, smoke a cigarette . . . when you get a like on social media, all of those experiences produce dopamine, which is a chemical that's associated with pleasure. When someone likes an Instagram post, or any content that you share, it's a little bit like taking a drug. As far as your brain is concerned, it's a very similar experience."[25]

44.     Defendants' social media products strategically became inextricable to daily lives and at the same time became detrimental to younger people's mental health. After a systematic review of the influence of social media, depression, anxiety, and psychological distress have a direct correlation to usage of social media.[26]

45.     When the release of dopamine in young brains is manipulated by Defendants' products, it interferes with the brain's development and can have long-term impacts on an

---

[24] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).
[25] Eames Yates, What happens to your brain when you get a like on Instagram, Business Insider (Mar. 25, 2017), https://www.businessinsider.com/what-happens-to-your-brain-like-instagramdopamine- 2017-3; see also Sören Krach et al., The rewarding nature of social interactions, 4(22) Frontiers in Behav. Neuro., (28 May 2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2889690/pdf/fnbeh-04-00022.pdf; Julian Morgans, The Secret Ways Social Media Is Built for Addiction, Vice (May 17, 2017), https://www.vice.com/en/article/vv5jkb/the-secret-ways-social-media-is-built-for-addiction.
[26] Luisa Speranza et al., Dopamine: The Neuromodulator of Long-Term Synaptic Plasticity, Reward and Movement Control, 10 Cells 735 (2021), https://pubmed.ncbi.nlm.nih.gov/33810328/.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

individual's memory, affective processing, reasoning, planning, attention, inhibitory control, and risk-reward calibration.[27]

46.     Children and adolescents have a limited capacity to self-regulate and are extremely vulnerable to peer pressure. Therefore, they are at a greater risk of developing mental disorders from use of Defendant's products. In order to cope, Children withdraw when the dopamine hit wears off. Withdrawal can include anxiety, dysphoria, and irritability. Due to Children's limited ability to regulate emotions, they are more likely to deal through compulsive behaviors.

47.     This leads to a lack of neuroadaptation. If a child's brain can't learn to regulate on its own, it builds up a tolerance for the stimulus and sensitivity of dopamine receptors are reduced.[28]

48.     Evidently, Defendants "deliberately designed, engineered, and implemented dangerous features in their apps that present social-reward and other stimuli in a manner that has caused Plaintiff[] and many scores of others to compulsively seek out those stimuli, develop negative symptoms when they were withdrawn, and exhibit reduced impulse control and emotional regulation."[29]

### C.  Defendants Designed Products to Attract and Addict Youth

49.     Facebook and Instagram are designed and engineered to entice young people which creates an unreasonable risk of compulsive use and addiction.[30]  An example is the way Facebook and Instagram "harvest user data and use this information to generate and push algorithmically

---

[27] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).

[28] George Koob & Nora Volkow. Neurobiology of addiction: a neurocircuitry analysis, 3 (8) Lancet Psychiatry 760-773 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6135092/pdf/nihms-985499.pdf.

[29] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).

[30] See Kevin Hurler, For Sites Like Instagram and Twitter, Imitation Is the Only Form of Flattery, Gizmodo (Aug. 16, 2022), https://gizmodo.com/instagram-tiktok-snapchat-facebook-meta-1849395419 ("Over the last decade, some of the most popular social media apps have blatantly ripped off features from some of the other most popular social media apps, in a tech version of Capture the Flag where the only losers are the users who are forced to persist through this cat and-mouse game.").

tailored "feeds" of photos and videos . . . through which approval can be expressed and received, such as likes, hearts, comments, shares, or reposts."[31]  Comparable to using drugs or smoking a cigarette, receiving a "like" on a social media account produces the same dopamine chemical in the brain.[32] This similarity is no coincidence. Over time Defendants methodically and strategically tweaked its defective algorithms until they became almost impossible to resist.[33] There are psychological and social mechanisms used by Defendants to exploit users.

50.    *First,*  Defendants utilized highly addictive intermittent variable rewards to deceive users. Defendants understood the brain releases euphoria-causing dopamine when a user receives a "like" on their shared content. Defendants exploited the user by creating a system of methodical, but unpredictable, dopamine triggering rewards with dopamine gaps. This method is referred to as intermittent variable rewards ("IVR"). IVR creates stronger associations than fixed rewards and using this technique is known to be highly addictive.

51.    Similar psychological tactics are used in slot machines, delivering rewards in a randomized manner. Defendants engineered an algorithm which can determine a specific users cravings and keep them using the product. For example, Instagram's notification algorithm will at times determine that a particular user's engagement will be maximized if the app withholds "Likes" on their posts then later delivers them in a large burst of notifications.[34]

52.    Defendants use of IVR on adolescents is particularly dangerous and harmful. Ironically, slot machines are highly regulated due to the known risk of addiction. There are age

---

[31] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).
[32] Irresistible: The Rise of Addictive Technology and the Business of Keeping Us Hooked Hardcover – March 7, 2017 by Adam Alter
[33] Irresistible: The Rise of Addictive Technology and the Business of Keeping Us Hooked Hardcover – March 7, 2017 by Adam Alter
[34] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).

limits set on gambling, there should be protections for adolescents on addictive and defective social media as well.

53.      In addition, the effect on minors is not only addictive, but their brains are extremely susceptible to input at this age and they adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. Instead of restoring neutrality in their brains, these platforms provide the opportunity to avoid dejection by continuing to scroll. This creates a dopamine driven feedback loop. Former Vice President of User Growth at Facebook admittedly states feeling "tremendous guilt for their role in affecting users' brains and thought patterns"[35] Defendants are aware of the dopamine surges and subtly integrate techniques in their products to create compulsive loops. One of the differences between other mediums and social media is the lack of "stopping cues."[36] Stopping cues are indicators the user should move on to another activity. Instead, Instagram designed algorithms to entice users to spend as much time as possible on the platform through an endless feed loop.

54.      *Second,* defendants have not only capitalized on the dopamine neurons which are affected by reward, but also the ones affected by non-rewarding and/or painful stimuli. Through ranking photos and videos that are "engaging," including novel, aversive and alarming images, the user experiences a dopamine payoff. [37]

55.      *Third,* Defendants manipulate users through the exploitation of reciprocity. For example, features such as the three dots which pop up when someone is typing or the immediate indication you have read a message are designed to bring you back quicker and keep you on the

---

[35] https://outlook.monmouth.edu/2021/03/dopamine-driven-feedback-loops-what-are-
they/#:~:text=A%20dopamine%2Ddriven%20feedback%20loop,%E2%80%9D%20according%20to%20WhatIs.co
m.
[36] https://www.apa.org/monitor/2022/03/feature-minimize-instagram-effects
[37] J.P.H. Verharen, Yichen Zhu, and Stephan Lammel Aversion hot spots in the dopamine system 64 Neurobiology
46-52 (March 5, 2020) https://doi.org/10.1016/j.conb.2020.02.002.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

app longer. The read receipts are designed using a social exchange principle called reciprocity. The idea is that people follow the societal norm of giving and receiving benefits or actions of others. If a user receives a message and opens it, since the other person can see they read it, the user feels obligated to respond. Thereby, pressuring them into an interaction they may not have chosen to have if it were not for the read receipt. Defendants could make the read receipts optional, thereby alleviating the pressure for the users who choose that option, but like many other aspects of the algorithms Defendants have chosen profit over ethics.

56.    *Fourth*, Defendants exploit young users heightened need for social validation and interpersonal feedback-seeking by encouraging repetitive usage and amplifying the already present status anxieties and insecurities. Because of their relatively undeveloped prefrontal cortex, young users have trouble distinguishing the fundamental differences between online and real-world interactions. Online interactions enable social comparisons that are not existent in the real world. For example, "[a]fter you walk away from a regular conversation, you don't know if the other person liked it, or if anyone else liked it."[38] Defendants designed their apps to allow friends and strangers to control dopamine-laced likes, comments, views, or follows.[39]

57.    This has a powerful effect on teenagers. Studies have shown that teens base their opinion of a photo on how many likes and comments it receives. However, the likes and comments are often fake, purchased, or manufactured, resulting in teens having a distorted view of themselves and reality as a whole**.**

58.    *Fifth,* Defendants' carefully curated products work together to create a hypnotic trance, completely consuming the user. Defective features foreseeably lead to a multitude of

---

[38] Zara Abrams, Why young brains are especially vulnerable to social media, Am. Psych. Ass'n (Aug. 25, 2022), https://www.apa.org/news/apa/2022/social-media-children-teens.
[39] Zara Abrams, Why young brains are especially vulnerable to social media, Am. Psych. Ass'n (Aug. 25, 2022), https://www.apa.org/news/apa/2022/social-media-children-teens.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

mental health injuries in young people. Some, but not all of the injuries are: eating and feeding disorders, lack of focus; body dysmorphia; headaches, migraines; loss of vision; eye strain; self-harm; depressive disorders; anxiety disorders, sleep disorders; trauma-and stressor-related disorders; obsessive compulsive and related disorders; disruptive, impulse-control, and conduct disorders, suicidal ideations; self-harm; and suicide.[40]

**D. Defendants have created a Mental Health Crisis for the Millions of Adolescents Who Engage with these Products**

59.    Defendants strategically targeted adolescents, theorizing, if they get hooked young, they will be hooked forever. Unfortunately, it was successful with reports showing one-third of 7- to 9-year-olds are on social media, half of 10- to 12-year-olds are on social media and 90% of 13- to 17-year-olds are on social media. [41] Not only do they have an account, but sixty-two percent say they use the platform daily. [42] One-in-six describe their use of Instagram as "constantly."[43]

60.    To put the statistics in perspective, "[i]n 2022, two billion users worldwide were active on Instagram each month." [44]

61.    Addiction is a neuropsychological, compulsive, chronic, intense urge to use a drug or engage in a behavior that produces a natural reward, despite causing anxiety and irritability upon withdrawal. When asked, teens admit they spend too much time on social media but can't stop themselves. Around 71% of the teens who use it "almost constantly" agree it would be

---

[40] E.g., Nino Gugushvili et al., Facebook use intensity and depressive symptoms: a moderated mediation model of problematic Facebook use, age, neuroticism, and extraversion at 3, BMC Psych. 10, 279 (2022), https://doi.org/10.1186/s40359-022-00990-7 (collecting sources).
[41] Sharing Too Soon? Children and Social Media Apps, C.S. Mott Child's Hosp. Univ. Mich. Health (Oct. 18, 2021), https://mottpoll.org/sites/default/files/documents/101821_SocialMedia.pdf.
[42] Victoria Rideout et al., Common Sense Census: Media use by tweens and teens, 2021 at 31, Common Sense Media (2022), https://www.commonsensemedia.org/sites/default/files/research/report/8-18-census-integratedreport- final-web_0.pdf.
[43] Emily Vogels et al., Teens, Social Media and Technology 2022, Pew Rsch. Ctr. (Aug. 10, 2022), https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology- 2022/.
[44] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

difficult to stop.[45] Despite using it constantly, many teens admit they don't enjoy it and believe that social media is the cause of the mental health crisis among youths today.[46]

62.     Over the last decade research shows Defendants' platforms have a detrimental effect on the mental health of a child. This is intensified when adolescents are compulsively using the platforms. Studies have shown Defendants' products are linked to a number of mental and behavioral problems including but not limited to: "(1) a lessening of control, (2) persistent, compulsive seeking out of access to the product, (3) using the product more, and for longer, than intended, (4) trying to cut down on use but being unable to do so, (5) experiencing intense cravings or urges to use, (6) tolerance (needing more of the product to achieve the same desired effect), (7) developing withdrawal symptoms when not using the product, or when the product is taken away, (8) neglecting responsibilities at home, work, or school because of the intensity of usage, (9) continuing to use the product even when doing so interferes and causes problems with important family and social relationships, (10) giving up important or desirable social and recreational activities due to use, and (11) continuing to use despite the product causing significant harm to the user's physical and mental health." [47]

63.     Over the last 2 decades, suicide rates among youth have increased by 57%[48] and for emergency room visits for anxiety disorders rates have increased by 117%.[49]

---

[45] Emily Vogels et al., Teens, Social Media and Technology 2022, Pew Rsch. Ctr. (Aug. 10, 2022), https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022/.

[46] Headspace (2018) National youth mental health survey 2018, National Youth Mental Health Foundation (2018), https://headspace.org.au/assets/headspace-National-Youth-Mental-Health- Survey-2018.pdf.

[47] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).

[48] Protecting Youth Mental Health: The U.S. Surgeon General's Advisory at 8, U.S. Dep't Health & Hum. Servs. (Dec. 7, 2021), https://www.hhs.gov/sites/default/files/surgeon-general-youthmental-health-advisory.pdf.

[49] Charmaine Lo, Children's mental health emergency department visits: 2007-2016, 145(6) Pediatrics e20191536 (June 2020), https://doi.org/10.1542/peds.2019-1536.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

64.    In 2021, the Surgeon General even issued an advisory on the youth mental health crisis.[50] The Surgeon General explained, "[m]ental health challenges in children, adolescents, and young adults are real and widespread. Even before the pandemic, an alarming number of young people struggled with feelings of helplessness, depression, and thoughts of suicide—and rates have increased over the past decade."[51]Those "mental health challenges were the leading cause of disability and poor life outcomes in young people."[52]

## E.  Defendants' Defective Products Contribute to the Sexual Exploitation and Sextortion of Minors

65.    Defendants have been aware of sexual predators using their platforms to target and exploit minors for years. These predators congregate on Defendant's platforms attributable to the continual stream of easy access to victims who are addicted to the products. On February 7, 2023, the FBI and international law enforcement agencies issues a joint warning about the global "financial sextortion crisis" which stated: "Financial sextortion can happen anywhere, although it mainly occurs on the digital platforms where children are already spending their screen time, like social media and gaming websites, or video chat applications. On these platforms, predators often pose as girls of a similar age and use fake accounts to target young boys, deceiving them into sending explicit photos or videos. The predator then threatens to release the compromising materials unless the victim sends payment, however, in many cases, the predator will release the

---

[50] U.S. Surgeon General Issues Advisory on Youth Mental Health Crisis Further Exposed by COVID-19 Pandemic, U.S. Dep't Health & Hum. Servs. (Dec. 14, 2021), https://adasoutheast.org/u-s-surgeon-general-issues-advisory-on-youth-mental-health-crisisfurther-exposed-by-covid-19-pandemic/.

[51] U.S. Surgeon General Issues Advisory on Youth Mental Health Crisis Further Exposed by COVID-19 Pandemic, U.S. Dep't Health & Hum. Servs. (Dec. 14, 2021), https://adasoutheast.org/u-s-surgeon-general-issues-advisory-on-youth-mental-health-crisisfurther-exposed-by-covid-19-pandemic/.

[52] 121 U.S. Surgeon General Issues Advisory on Youth Mental Health Crisis Further Exposed by COVID-19 Pandemic, U.S. Dep't Health & Hum. Servs. (Dec. 14, 2021), https://adasoutheast.org/u-s-surgeon-general-issues-advisory-on-youth-mental-health-crisisfurther-exposed-by-covid-19-pandemic/.

images anyway."[53] Defendants have not only failed to mitigate the risk of sexual exploitation and harm to children, they have exacerbated it by implementing defective product features that enable sexual predators to connect with children.[54] Some of the defective product features, which Defendants have been made aware contribute to the sextortion are flawed age verification, lack of meaningful mechanisms to prevent sham accounts, default-public profiles, matching and recommending connections between adults and minors, promoting unsolicited messages and interactions from adults, and wholly inadequate and ineffective parental controls. These defective features aid predators in identifying, targeting, accessing, and exploiting children.

66.　　In addition, Defendants regularly fail to report abuse when brought to their attention. Steve Grocki, the U.S. Department of Justice's Chief of the Criminal Division's Child Exploitation & Obscenity Section, put it this way: "A lot of times, someone has come across something problematic and the platform isn't doing anything[.]" He went on to say, "[t]hese reports can be of great value because they signal where there are big problems and we can flag those issues to Internet companies, such as when products are being exploited by offenders, they aren't meeting reporting requirements, or when children under the age restriction are accessing inappropriate content."[55]

67.　　Defendants knowingly and foreseeably empower sexual predators to connect with minors by failing to implement adequate age and identity verifications on the products. Defendants have been made aware that sexual predators utilize their products and exploit their defective design features. Examples of defective age verification on Defendants' products include:

---

[53] International Law Enforcement Agencies Issue Joint Warning about global financial sextortion crisis, FBI (2023), https://www.fbi.gov/news/press-releases/international-law-enforcementagencies-issue-joint-warning-about-global-financial-sextortion-crisis.
[54] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).
[55] Equality Now, Steve Grocki Expert Interview - United States (Nov. 15, 2021), https://www.equalitynow.org/stories/steve-grocki-expert-interview-united-states/.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

(1) "Inaccurate information: Users can easily enter false information, such as a fake date of birth, to bypass age restrictions;

(2) No measures to prevent sham accounts: Defendants' products are structured so that users can easily create multiple accounts under different names and ages; and

(3) Incomplete implementation: Defendants' products only partially implement age verification, such as requiring users to provide their date of birth but not verifying it through any means."[56]

68.    The mindboggling part is Defendants "possess the technology to identify minors who are posing as adults and adults who are posing as minors, but they do not use this information to identify violative accounts and remove them from their products."[57]

69.    Predators have capitalized on features such as the default public profile for minors to gain access to personal information on children. In effect, "Defendants have supplied sexual predators with detailed background information about children, including their friends, activities, interests, and even location. By providing this information, these Defendants put children at risk of being approached and befriended by sexual predators. These young targets had no idea that their posts, friends, pictures, and general online sharing represented a windfall of information that a predator could use to sexually exploit or abuse them."[58]

70.    Meta's own research pointed out the vast majority of harmful interactions received by users come from unconnected adults, yet Meta has dragged their heels in restricting who can reach minor users through Direct Message features.[59]

---

[56] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).
[57] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).
[58] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).
[59] META3047MDL-003-00107197.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

71.     Defendants compel vulnerable adolescents, uniquely susceptible to experienced sexual predators, to compulsively engage with their social media accounts through "a powerful combination of algorithmic recommendations and addictive features designed to make it hard for a user to disengage."[60]

72.     Sexual predators continue to benefit from Defendants' defective product features. One example is the "vanishing" feature in direct messages on Instagram. This feature is especially advantageous to predators as they can use it in multiple ways. One way they use it is to send explicit, harmful, and unsolicited messages to minors without fear of repercussions. Since the message "disappears" after the minor reads it there is no proof of the message tying it back to the predator. Another way predators use this vanishing feature is by pretending to be another minor and convincing the user to send compromising photos or videos of themselves, assuring them there is no risk due to the image disappearing after it is read. Unbeknownst to the minor, the experienced predator has a way of capturing the image before it disappears, and the young user is then exploited in a scheme called "sextortion". In these horrific and severe cases, predators use these images to blackmail victims into sending money, often threatening to circulate the sexual images to family and friends if they are not given the money.  Meta has been made aware their products assist predators with this scheme countless times, yet no changes have been made to the defective products.

73.     As a direct and foreseeable consequence of Defendants' connecting children to sexual predators, Defendants' products facilitate and increase the risk of sexual exploitation, sexual abuse, and sextortion of children.[61]

---

[60] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).
[61] "Sextortion is a form of sexual exploitation. The offender uses coercion and threats to compel the victim to produce sexual images or videos engaging in sexual acts. Sometimes the offender already possesses nude or sexual images of the victim, and is threatening to release them if the victim will not do as the offender commands." United

74.     Predators use Defendants' products for a multitude of wrongs including to facilitate commercial sex acts. This includes the production and distribution of known Child Sex Abuse Material ("CSAM").[62]  Defendants are aware its defective products facilitate the production and distribution of this illegal material, yet have failed to design their apps with readily available technology or less exploitative features that in conjunction with each other could curb, rather than fuel the fire of sexual exploitation and sextortion of adolescent users. In *Paroline v. United States,* the court held "[t]he unlawful conduct of everyone who reproduces, distributes, or possesses the images of the victim's abuse … plays a part in sustaining and aggravating this tragedy."[63]

75.     Not only have Defendants failed to implement proactive modifications to their algorithms, but Defendants have also defectively designed their reporting tools, making it exceptionally difficult to report material related to child exploitation. The reporting tools on Defendants' products were designed with no specific function to report CSAM, therefore it must be reported as "generally harmful material." This would be a very simple modification that would assist victims in reporting predators.

76.     What's more, when victims do request material be removed, Defendants are often unresponsive until legal correspondence is involved.[64] In many cases, Defendants design defect also hinders Defendants' ability to provide timely information to child welfare and law

---

States Attorney's Office Southern District of Indiana, What is Sextortion?, https://www.justice.gov/media/844516/dl?inline.

[62] The term CSAM includes any definition of "Child Pornography" under 18 U.S.C. § 2256(8) and corresponding caselaw, including but not limited to, United States v. Dost, 636 F. Supp. 828, 832 (S.D. Cal. 1986), aff'd sub nom. United States v. Wiegand, 812 F.2d 1239 (9th Cir. 1987), and aff'd, 813 F.2d 1231 (9th Cir. 1987); see also Canadian Centre for Child Protection Report, Project Arachind: Online Availability of Chis Sexual Abuse Material, https://protectchildren.ca/pdfs/C3P_ProjectArachnidReport_Summary_en.pdf.

[63] Paroline v. United States, 572 U.S. 434, 457 (2014).

[64] Angus Crawford, Facebook failed to remove sexualized images of children, BBC News (Mar. 7, 2017), https://www.bbc.com/news/technology-39187929.

enforcement agencies, even when Defendants know or should know children are in immediate danger.[65]

77.     Additionally, there are industry proven and freely available child protection tools, Defendants have failed to implement. Not implementing such protection tools substantially increases the products' danger to children. Tools such as, "Project Arachnid Shield, detect[] CSAM on a platform through process[ing] thousands of images per second and send[ing] removal notices to electronic services providers. Project Arachnid Shield is a free Application Programming Interface ("API") that Defendants could incorporate into the design of their apps, which would increase their safety and prevent child exploitation and the distribution of CSAM through their products."[66]

78.     In 2021, The Thorn organization published a report detailing the myriad of problems of child sexual exploitation that were present throughout Facebook, Instagram, and other social media platforms. [67] Thorn presented Meta with its findings about sexual exploitation on its platforms. Thorn's key findings were:

(1) "[O]ne-quarter of participants (25%) reported having had an online sexual interaction with someone they thought was 18 or older;"

(2) "Younger (9-13) children and LGBTQ+ children are at higher risk (9–13-year-olds 20% sexual experience with adult, 32% of LGBTQ youth);"

(3) "Neither blocking nor reporting [offenders] protects minors from continued harassment;"

---

[65] Canadian Centre for Child Protection, Resources & Research: Reviewing Child Sexual Abuse Material Reporting Functions On Popular Platforms, https://protectchildren.ca/en/resourcesresearch/csam-reporting-platforms/ (last visited Feb 9, 2023).
[66] Project Arachnid, https://www.projectarachnid.ca/en/#shield.
[67] META3047MDL-003-00186841 (May 2021, Responding to Online Threats: Minors' Perspectives on Disclosing, Reporting and Blocking. Findings from 2020 Quantitative Research among 9-17 year olds).

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

(4) "[R]ecidivism is a problem: over half of participants who had blocked (55%) or reported (55%) someone, said they were recontacted online. Younger boys are particularly at risk;"

(5) "Kids reporting having difficulties finding the right reporting categories when they did decide to report- they also noted that things like "involves a child" doesn't resonate with them as teens;"

(6) "17% of respondents who used FB say they have had a harmful experience, 10% said they had a sexual interaction on the platform;"

(7) "26% of respondents who used IG say they have had a harmful experience, 16% said they have had a sexual interaction on the platform;"

(8) "18% of respondents who used Messenger say they have had a harmful experience, 11% said they had a sexual interaction on the platform. In 6% of these sexual interactions the minor believed the person was 18%."[68]

## F.  Defendants Could Have Avoided Harming Plaintiffs

79.     Each Defendant solicited users, including Plaintiff, and encouraged the use of their defective products.

80.     Defendants offered their product to the public, knowing there were dangerous features, unknown to the user, which Plaintiff could not bargain to change.

81.     Plaintiff conferred a benefit on Defendants by using the products.

82.     Defendants chose not to remedy their products, even though there were options available that would alleviate risk and harm to adolescents using their product.

---

[68] META3047MDL-003-00186838.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

83.     Defendants knew or should have known that the more children use social media, the harder it is to quit.

84.     Defendants should have known that excessive use of its products would have severe effects on adolescents' mental health.

85.     Each Defendant knew or should have known that the design of its products attracts enables, and facilitates child predators, and that such predators use its apps to recruit and sexually exploit children for the production of CSAM and its distribution on Defendants' products.

86.     It was foreseeable to Defendants, the longer an adolescent used its defective product, the higher the possibility was they would be targeted by an adult predator.

87.     Nevertheless, Defendants failed to adequately warn Plaintiffs of the known risks and harms of using its products. Defendants failed to modify their products to increase safety and instead, utilized changes known to be harmful, risky, and keep children addicted.

88.     Defendants bear the burden of controlling the risks of harm, ensuring safety of its products, and alleviating the spread of any harm resulting from defects.

89.     Users of the platforms has no way of knowing the defects or harms which flowed from the apps before joining them.

**G. Defendants Consistently Refer to and Treat their Apps as Products**

90.     Meta consistently characterizes its platforms as products. In regulatory filings, communications with investors, and statements to public officials Meta refers to Facebook, Instagram, Messenger, and WhatsApp as products. During a statement made to the Senate Commerce and Judiciary Committees, Zuckerberg refers to his apps as products.[69]  Specifically**,**

---

[69] Bloomberg Government, Transcript of Mark Zuckerberg's Senate Hearing, Washington Post (Apr. 10, 2018), https://www.washingtonpost.com/news/the-switch/wp/2018/04/10/transcript-ofmark-zuckerbergs-senate-hearing/.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

"[h]e noted that Facebook "want[s] our products to be valuable to people."[70] And he stated that, "fundamentally, at our core, [Meta is] a technology company where the main thing that we do is have engineers and build products."[71]

91.     Defendants treat the apps as "mass-produced, mass marketed products that each of the Defendants designs, tests, researches, builds, ships, markets, and makes widely available in the stream of commerce for personal use by consumers, including youth."[72] Defendants have product managers and product teams responsible for the management of their platforms. Zuckerberg commented on Instagram in a 2012 interview, noting Instagram "has a super talented group of, of engineers. They're building [this] amazing product." Meta employees often complement each other's "great product improvement[s]."[73]

92.     Employees have even referred to their apps as products when expressing concerns about the platforms, stating I'm anxious about whether FB the product is good for the world."[74] Meta's apps and platforms are intrinsically products. Meta's executives refer to their apps and platforms as products, they employee teams of people for the sole purpose of managing the "product" and in conversations about releasing product into the stream of commerce.

V.     **META Specific Factual Allegations**

A.  **Modification of Instagram's Product Features Over Time**

---

[70] Bloomberg Government, Transcript of Mark Zuckerberg's Senate Hearing, Washington Post
(Apr. 10, 2018), https://www.washingtonpost.com/news/the-switch/wp/2018/04/10/transcript-ofmark-zuckerbergs-senate-hearing/.
[71] Bloomberg Government, Transcript of Mark Zuckerberg's Senate Hearing, Washington Post
(Apr. 10, 2018), https://www.washingtonpost.com/news/the-switch/wp/2018/04/10/transcript-ofmark-zuckerbergs-senate-hearing/.
[72] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).
[73] Haugen_000020610.
[74] Haugen_00012484 at Haugen_ 00012553.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

93. Before Instagram was acquired by Facebook, it was a simple site to share pictures and see friends' pictures. Users could post and like, but it was shown in chronological order and there were not any deceitful algorithms secretly determining the content shown.

94. Since Facebook acquired Instagram, there are a host of additional features directed at pre-teen and teenage activity, hoping to compel them to use the product and in return drive up advertising revenues. In 2013 Meta added Instagram Direct, a feature transforming Instagram from a platform to only share photos to a platform to send direct messages as well. In 2015, Meta began interweaving advertisements into users feeds. In 2016, Meta eliminated the chronological feed and implemented and engagement based-ranking algorithm. A few months later Meta introduced view counts to videos posted and introduced the ability to like other users comments on posts with a heart emoji. These are examples of features used as a source of additional motivation by users to seek social acceptance and validation. In January of 2018, a feature was introduced allowing users to seek if another person was active, indicated by a green circle beside their name. This feature exploits social reciprocity and as explained above promotes extended use on the platform.

95. In 2018, Instagram allotted most of its global annual budget to targeting 13- to 15-yearold children. [75] According to Meta, "Youth and Teens are critically important to Instagram. While Instagram has strong market-fit with Teens, we know we need to constantly 're-win' this segment."[76]

## B. Meta Intentionally Encourages Adolescents to use its Products and then Leverages that Usage to Increase Revenue

---

[75] Sheera Frenkel et al., *Instagram Struggles With Fears of Losing Its 'Pipeline': Young Users*, N.Y. Times (Oct. 16, 2021), https://www.nytimes.com/2021/10/16/technology/instagramteens. html.
[76] META3047MDL-003-00030070 at META3047MDL-003-00030071.

96.    Meta's defective design, including their algorithms and underlying codes, are to be credited for its massive success. Meta's goal is to make users as compulsively hooked on the platform as possible. The more users come back, the more Meta can monetize its users and their data by selling ad placements to marketers.[77] In 2019 Meta generated $69.7 billion from advertising. [78]

97.    Meta's business model is designed to addict users to Facebook and Instagram to increase ad sales. Meta uses algorithms in its products to induce compulsive and continuous scrolling for hours on end. [79] Instagram's key demographic are adolescents with vulnerable minds. Meta targets these users and provides no warnings to them or their guardians about the known risks to mental, emotional, and behavioral health of the child.

98.    Meta collects droves of user data from the time a user begins interacting with the platform. Meta constructs an extensive and unique fingerprint of a user's data. From what the user looks at, to how long they hover over certain images, to what advertisements they click on or ignore Meta is tracking and storing all of this information. Meta continuously refines this fingerprint by monitoring and measuring patterns in the user's behavior. [80]

99.    Meta's utilizes advanced AI systems to draw educated inferences about user's behavior which enables it to target and influence the user to increase engagement.

---

[77] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).
[78] Rishi Iyengar, Here's How Big Facebook's Ad Business Really Is, CNN (July 1, 2020), https://www.cnn.com/2020/06/30/tech/facebook-ad-business-boycott.
[79] *See* Christian Montag, et al., *Addictive Features of Social Media/Messenger Platforms and Freemium Games against the Background of Psychological and Economic Theories*, 16 Int'l J. Env't Rsch. and Pub. Health 2612, 5 (July 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6679162/ ("One technique used to prolong usage  time in this context is the endless scrolling/streaming feature."); *see generally*, Ludmila Lupinacci, 'Absentmindedly scrolling through nothing': liveness and compulsory continuous connectedness in social media, 43 Media, Culture & Soc'y 273 (2021), https://journals.sagepub.com/doi/epdf/10.1177/0163443720939454 (describing the ways that users use and experience social media apps).
[80] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

100.    In 2018, Instagram "earmarked almost its entire global annual marketing budget – slated at $390 million this year – to targeting teenagers." [81]

101.    Meta software engineers have conceded aggressive tactics have been resorted to in the name of growth. [82] Facebook and Instagram have exploited vulnerabilities in the human psychology to compel users to compulsively use their products. In a 2017 interview Facebook's first President described the devastating impact of their design decisions:

> God only knows what it's doing to our children's brains. . . . The thought process that went into building these applications, Facebook being the first of them, . . . was all about: 'How do we consume as much of your time and conscious attention as possible?' . . . And that means that we need to sort of give you a little dopamine hit every once in a while, because someone liked or commented on a photo or a post . . . . And that's going to get you to contribute more content, and that's going to get you . . . more likes and comments. . . . It's a social-validation feedback loop . . . exactly the kind of thing that a hacker like myself would come up with, because you're exploiting a vulnerability in human psychology. . . . The inventors, creators — it's me, it's Mark [Zuckerberg], it's Kevin Systrom on Instagram, it's all of these people — understood this consciously. And we did it anyway.[83]

102.    Consequently, "many tech leaders, [including Zuckerberg] with inside knowledge of the defects of Meta's social media platforms, either ban or severely limit their own children's access to screen time and social media."[84]

### C.  Meta Intentionally Designed Product Features to Addict Children and Adolescents

103.    Meta's known design defects include but are not limited to, "(a) recommendation algorithms, fueled by extensive data collection, which are designed to promote use in quantities and frequency harmful to adolescents; (b) product features that prey upon children's desire for

---

[81] Sheera Frenkel, et al., *Instagram Struggles with Fears of Losing Its 'Pipieling': Young Users,* The New York Times, (Oct 2021), https://www.nytimes.com/2021/10/16/technology/instagramteens.html#:~:text=In%20the%20face%20of%20that,directly%20involved%20in%20the%20process.
[82] Haugen_00010114 at Haugen_00010121.
[83] See, e.g., META3047MDL-003-00161881 at META3047MDL-003-00161915 (highlighting moderate decline in sessions among teen Instagram users in the United States).
[84] See META3047MDL-003-00170806 at META3047MDL-003-00170822 (Instagram sessions "cannot decrease").

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

validation and need for social comparison; (c) product features that are designed to create harmful loops of repetitive and excessive product usage; (d) a lack of effective mechanisms, despite having the ability to implement them, to restrict children's usage of the platforms; (d) inadequate parental controls, and facilitation of unsupervised use of the platforms; and (e) intentionally placed obstacles to discourage cessation of use of the platforms. Facebook and Instagram have been designed, maintained, and constantly updated by one of the world's most wealthy, powerful, and sophisticated corporations. Large teams of expert data scientists, user experience ("UX") researchers, and similar professionals have spent years fine-tuning these platforms to addict users. Every aspect of the platforms' interfaces, each layer of their subsurface algorithms and systems, and each line of underlying code has been crafted by brilliant minds. Every detail—the color of icons, the placement of buttons within the interface, the timing of notifications, etc.—is designed to increase the frequency and length of use sessions. Therefore, it is impractical to create a comprehensive list of addictive, harm-causing defects in the app until in-depth discovery occurs. Many features, such as the inner workings of Meta's algorithms, are secret and unobservable to users. Discovery during this litigation will reveal additional detail about the defective, addictive, and harmful design of Meta's platforms."[85]

### i. Facebook and Instagram's Algorithms Maximize Engagement Promoting use at Levels and Frequency that is Harmful to Kids

104.    Meta knew its potential for revenue if adolescents became addicted to their platforms. Therefore, it  "has invested its vast resources to intentionally design Facebook and Instagram to be addictive to adolescents, all the while concealing these facts from its users and the public."[86]

---

[85] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).
[86] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

105.    As previously stated, Meta's algorithms originally ranked feeds chronologically. This evolved into an engagement based ranking system. Even with this modification within a few years, Meta faced declining engagement and pivoted to a "meaningful social interaction" ("MSI") system. MSI prioritized content users were more likely to engage with.

106.    As a result of Meta's algorithms, including MSI and other engagement based ranking systems, it controls the content users are exposed to. Specifically, "Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta, to which it assigns categorical designations) along with a dossier of similar users. Meta's algorithms identify and rank recommended posts to optimize for various outcomes, such as for time-spent by a user or for user engagement. This often has the effect that Meta's algorithms direct users to alarming and aversive material."[87]

107.    Meta strives to create the public perception of a company "[g]iv[ing] people the power to build community and bring[ing] the world closer together."[88] In fact, Meta prioritizes platform use over social connection at the detriment of the health and safety of young people.[89] Meta's bottom line is increased, but it comes at the expense of young users' mental health.

108.    Even Zuckerberg has acknowledged the "correlation between engagement and sensational posts so extreme that they impinge upon Meta's own ethical limits, with the following chart:"[90] Other employees at Meta have also discussed the design change, remarking "we only

---

[87] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).
[88] Will Oremus, How Facebook Designed the Like Button—and made social media into a Popularity Contest, Fast Company (Nov. 15, 2022), https://www.fastcompany.com/90780140/the-inside-story-of-how-facebook-designed-the-likebutton-and-made-social-media-into-a-popularity-contest.
[89] Will Oremus, How Facebook Designed the Like Button—and made social media into a Popularity Contest, Fast Company (Nov. 15, 2022), https://www.fastcompany.com/90780140/the-inside-story-of-how-facebook-designed-the-likebutton-and-made-social-media-into-a-popularity-contest.
[90] Will Oremus, How Facebook Designed the Like Button—and made social media into a Popularity Contest, Fast Company (Nov. 15, 2022), https://www.fastcompany.com/90780140/the-inside-story-of-how-facebook-designed-the-likebutton-and-made-social-media-into-a-popularity-contest.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

cared about things like time spent, open links, etc. That's what we optimized for. That's what we used to define success and failure. And that's the problem."[91]

> "Meta intentionally designed its MSI-focused algorithms to collect and analyze several kinds of data: a user's profile, what the user reports, what the user posts, what the user views and engages with, navigation paths, watch time, hover time (the amount of time a user viewed a piece of content), whether a user mutes or unmutes a video, and whether a user makes a   full video screen, among other data. Meta uses this data from adolescents to predict what posts will capture the user's attention. Meta also tracks and utilizes data from various other sources, such as a user's off-app activities and the activities on websites that contain Facebook or Instagram like or share buttons."[92]

109.    Another detrimental feature recognized by Meta is the way Instagram's algorithm shows users at risk of suicide or self-injury more content related to "suicide and self-injury (through explore, related, follower suggestions, etc.)."[93] "Because Meta's algorithm prioritizes engagement above all else, any harmful feeling or impulse that users have are amplified by Instagram—which becomes an echo chamber screaming their most upsetting thoughts back at them."[94]

110.    An example of the affect this can have on an adolescents' mental health is demonstrated through  a "14 year-old Molly Russell [who] took her own life after she was pushed reams of content related to suicide, self-injury, and depression by Instagram and several other platforms."[95] Even the coroner's report reflected the role Instagram played in Molly's death. Molly

---

[91] Will Oremus, How Facebook Designed the Like Button—and made social media into a Popularity Contest, Fast Company (Nov. 15, 2022), https://www.fastcompany.com/90780140/the-inside-story-of-how-facebook-designed-the-likebutton-and-made-social-media-into-a-popularity-contest.
[92] 92 Will Oremus, How Facebook Designed the Like Button—and made social media into a Popularity Contest, Fast Company (Nov. 15, 2022), https://www.fastcompany.com/90780140/the-inside-story-of-how-facebook-designed-the-likebutton-and-made-social-media-into-a-popularity-contest.
[93] Bob Leggit, How the Internet Destroyed Your Attention Span, Popzazzle (Apr. 30, 2021), https://popzazzle.blogspot.com/2021/04/how-the-internet-destroyed-your-attention-span.html.
[94] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).
[95] Billy Gallagher, Facebook Brings Notifications, Album-Specific Uploads to Standalone Camera App, Tech Crunch (Aug. 28, 2012), https://techcrunch.com/2012/08/28/facebook-bringsnotifications-album-specific-uploads-to-standalone-camera-app/?icid=tc_danschawbel_art&blogger=dan-schawbel#.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

was suffering from depression due to Instagram's addictive algorithms pushing content on her she had not sought out..[96]

> "The platform operated in such a way using algorithms as to result, in some circumstances, of binge periods of images, video clips and text some of which were selected and provided without Molly requesting them. These binge periods ... are likely to have had a negative effect on Molly.... In some cases, the content was particularly graphic, tending to portray self-harm and suicide as an inevitable consequence of a condition that could not be recovered from. The sites normalized her condition focusing on a limited and irrational view without any counterbalance of normality."[234] The coroner further observed that "[t]here was no age verification when signing up to the on-line platform" and that Molly's parents "did not have access, to the material being viewed or any control over that material."[97]

111.     Molly's tragic incident was not unforeseen, "Meta had conducted internal research which warned that there was a risk of "similar incidents like Molly Russell" because algorithmic features were "[l]eading users to distressing content."[98]

112.     During what is known as the "Rabbithole project", it is explained how Meta's "recommendations algorithms will start pushing you down a rabbit hole of more egregious content."[99] There are viable solutions if Meta is willing to change the algorithms, however it has "been resistant to making changes, for the explicit, profit-minded reason that such tweaks "came with a clear engagement cost."[100]

### ii.    Facebook's and Instagram's User Interfaces are Designed to Create Addictive Engagement

---

[96] Joe Lazauskus, The Untold Story of Facebook Live, Fast Company (Sept. 29, 2016), https://www.fastcompany.com/3064182/the-untold-story-of-facebook-live.

[97] 235 Casey Newton, Facebook Rolls Out Expanded Like Button Reactions Around the World, The Verge (Feb. 24, 2016), https://www.theverge.com/2016/2/24/11094374/facebook-reactions-likebutton.

[98] Natt Garun, Facebook Reactions Have Now Infiltrated Comments, The Verge (May 3, 2017), https://www.theverge.com/2017/5/3/15536812/facebook-reactions-now-available-comments.

[99] Casey Newton, Facebook Launches Stories to Complete its All-out Assault on Snapchat, The Verge (Mar. 28, 2017), https://www.theverge.com/2017/3/28/15081398/facebook-storiessnapchat-camera-direct.

[100] Nick Statt, Facebook Launches a Version of Messenger for Young Children, The Verge (Dec. 4, 2017), https://www.theverge.com/2017/12/4/16725494/facebook-messenger-kids-app-launchios-iphone-preview.

113.   *First*, Meta programs highly addictive intermittent variable rewards ("IVR") into its platforms. IVR is used to create a dopamine driven feedback loop encouraging endless scrolling. Children are vulnerable and more susceptible to this compulsion. Further, Meta fails to implement stopping cues, indicating to the user they should move onto another activity. The result is children addicted to their platforms, securing Meta's future revenue.

114.   *Second*, Facebook and Instagram utilize "Likes" to control the release of dopamine in children. Facebook and Instagram "harvest user data and use this information to generate and push algorithmically tailored "feeds" of photos and videos . . . through which approval can be expressed and received, such as likes, hearts, comments, shares, or reposts."[101]  Comparable to using drugs or smoking a cigarette, receiving a "like" on a social media account produces the same dopamine chemical in the brain.[102] Over time Meta methodically and strategically tweaked its defective algorithms using psychological and social mechanisms to exploit users. Not only are users compelled to continue using the platform, but defective algorithms exacerbate issues of social comparison and feedback seeking.

115.   Similar psychological tactics are seen in slot machines, delivering rewards in a randomized manner. Defendants engineered an algorithm which can determine a specific user's cravings and keep them using the product. For example, Instagram's notification algorithm will at times determine that a particular user's engagement will be maximized if the app withholds "Likes" on their posts then later delivers them in a large burst of notifications.[103] Internal studies have shown hiding likes for all users would decrease social comparison, however, it also

---

[101] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).
[102] Irresistible: The Rise of Addictive Technology and the Business of Keeping Us Hooked Hardcover – March 7, 2017
by Adam Alter
[103] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

demonstrated hiding likes would decrease users clicks on ad and by virtue of lower Meta's ad revenue. [104] Another example of Meta choosing profits over the mental health of its users.

116.    *Third*, Meta has designed features like Facebook Reels and Instagram reels to maximize immersion and engagement with the platform. For instance, Instagram reels automatically play as users scrolls, cannot be paused, and limited the length of the videos to accommodate users attention span. Meta further designed the Reels to intentionally display "likes" and "comments" while a video is playing without the user tapping to view comments. These are strategically timed to retain a user's attention.

117.    *Fourth*, Meta reaches out to less active users through notifications, and using the troves of data gathered on that user, sends messages containing information they may consider interesting. Intentionally, Meta displays only a limited amount of information, to entice the user to click on the link and re-engage with the platform.

> In December 2020, Meta internally acknowledged that the goal of this feature was to optimize engagement at the expense of value to users: "A few years ago we stopped sending out emails telling you what happened - e.g., telling you what your friend did - instead we just say 'someone comment [sic] on your post,' in the hope that you'll click through. This a clear value- engagement tradeoff.[105]

118.    *Fifth*, Meta designed the "stories" feature which is only viewable for a limited period of time, to create a sense of urgency in the user prompting them to return frequently to ensure they don't miss out on anything. This pressure works as a motivator to use the app daily or risk missing out on dopamine-causing stimuli.

119.    *Sixth*, Meta's algorithms recommend "keywords" and "hashtags" to teens which lead to dangerous and harmful results. In 2021, a Meta researcher put it like this: "A recurring area

---

[104] Facebook, Launching Reels on Facebook in the US (Sept. 29, 2021),
https://about.fb.com/news/2021/09/launching-reels-on-facebook-us/.
[105] Kim-Mai Cutler, From 0 to $1 billion in two years: Instagram's rose-tinted ride to glory
TechCrunch (Apr. 9, 2012), https://techcrunch.com/2012/04/09/instagram-story-facebookacquisition/.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

of concern is that we are recommending keywords related to significant safety and wellbeing concerns e.g. weight loss, diet pills, appetite suppressants. We have been flagging these terms as they appear and Product Policy and Product teams have been sweeping the list of keywords to remove them, but this is not sustainable and remains a significant safety, policy, and comms risk. Our current approach of catching all potentially risky terms in a 'block list' has not helped us avoid two news cycles, and the possibility of this happening a third time is a significant comms and policy risk."[106]

120.     Meta has long known the harmful defects in its products yet has not made any significant changes for the safety of its adolescent users.

121.     In 2017 almost 6 million people per week were "leaving Facebook" to take a temporary break, due to compulsive and obsessive thoughts.[107] In a study called "Facebook Addiction" Meta researched problematic users. These users defined ""problematic use" as meaning: "Serious problems with sleep, work or relationship that they attribute to Facebook AND concerns or preoccupations about how they use Facebook (e.g., a fear of missing out (FOMO) or lack of control)."[108]

122.     Meta acknowledged that teens obtain validation through being present on Instagram, lack the capacity to "switch off and shut down," and can be addicted to their products even if it makes them feel bad.[109] A focus group conducted on teens using Meta products showed teens don't like the amount of time they spend on the app, but they feel like they are 'addicted'.

123.     After years of forewarnings and recommendations to Meta regarding the significant need for safety tools on their products, Meta has consistently disregarded all such cautions.

---

[106] META3047MDL-003-00087111 at 7112.
[107] Haugen_00016893 at Haugen_00016898.
[108] Haugen_00021690 at Haugen_00021692.
[109] Haugen_00017069 at Haugen_00017128, Haugen_00017132.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

Publicly, Meta claims to utilize safety features, going as far as mocking others warnings as "BS . . . pseudo science," [sic] and "a bunch of people trying to get air time."[110] However, employees of Meta rebute this asserting Meta has not conducted studies to determine the effectiveness of supposed safety tools. Supporting employees assertion, "Meta acknowledged that the data reported by this tool was fundamentally "incorrect": "It's not just that Apple / Google have better data. Ours is wrong. Far worse. We're sharing bad metrics externally. We've been unable to right it despite several person months of efforts. . . . So it's wrong (bad enough in itself), can't be fixed easily (we've tried), has been half-rolled-out for a while . . . the group that audits metrics we provide to the outside world, has called us out on it…The reason this is relevant is we vouch for these numbers. Any day they're out there is a legal liability."[111]

124.    Many current and past employees of Meta allude to concerns of user safety being ignored by corporate. In 2020, a researcher for Facebook wrote an article explaining the ways Meta's leadership ignored her concerns about user safety: "Integrity teams are facing increasing barriers to building safeguards. . . . [T]ime and time again I've seen promising interventions from integrity product teams, with strong research and data support be prematurely stifled or severely constrained by key decision makers— often based on fears of public and policy stakeholder responses. Similarly (though even more concerning),  I've seen already built & functioning safeguards being rolled back for the same reasons . . . While mountains of evidence is (rightly) required to support a new intervention, none is required to kill (or severely limit) one. . . . [This] is intended as a call to reflection for those decision-makers imposing constraints."[112]

### D.  Meta Facilitates the Spread of CSAM and Child Exploitation.

---

[110] META3047MDL-003-00082165.

[111] META3047MDL-003-00157133 at META3047MDL-003-00157133.

[112] Haugen_00021096 at Haugen_00021097-Haugen_0002110 (emphasis omitted).

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

125.    Meta has been aware of the dangers their products promote by exacerbating sexual exploitation, the spread of CSAM, sextortion, and other socially maladaptive behaviors that harm children.

126.    There have been innumerable reports of sexual predators grooming children using Meta's platforms. For example, in 2010 a pedophile used Facebook to groom up to 1,000 children for sex. Detectives attacked Meta, saying "many sickening incidents could have been avoided if the social networking site had installed a 'panic button' which allows youngsters to alert authorities if they suspect they were being groomed."[113]

127.    Instagram has been informed their accounts steer pedophiles towards accounts belonging to children as young as eleven.[114] Despite its awareness of defective products, Meta continued to mislead the public by promoting its products as safe and family friendly. This could not be farther from the truth: "Meta not only tolerates child exploitation, but it also knowingly assists, supports, and/or facilitates child exploitation through its defective product features."[115]

128.    Meta has had a multitude of opportunities to reduce the prevalence of CSAM through simple, cost-effective technologies incorporated into the design of their products. Instead, Meta chose to disregard the safety of adolescents and continued promoting unsafe product designs.

129.    An example of an unsafe product design is Instagram's "Suggested for You" and "Because you Watched" features. These features connect strangers, including adult predators, with adolescent users.[116]

---

[113] Michael Seamark, Pedophile postman used Facebook and Bebo to groom up to 1,000 children for sex, DailyMail.com (May 28, 2010), https://www.dailymail.co.uk/news/article- 1282157/Facebook-grooming-How-pervert-postman-used-site-groom-hundreds-children.html.
[114] Shanti Das & Geoff White, Instagram sends pedophiles to accounts of children as young as 11, The Sunday Times (Dec. 1, 2019), https://www.thetimes.co.uk/article/instagram-sendspredators-to-accounts-of-children-as-young-as-11-j2gn5hq83. Meta was aware of this report. META3047MDL-003-00153063.
[115] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).
[116] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).

130.    Another one of the ways predators gain access to new children is through Instagram's defective algorithm personalizing recommendations of accounts to follow. For example, "[p]redators who follow users posting photos of young models, dancers or gymnasts are shown a stream of other images they will like and targeted with personalized recommendations of accounts to follow. Among the suggested accounts are newly created profiles belonging to children who would otherwise be almost impossible to find unless you had their username."[117]

131.    Likewise, Instagram's failure to implement effective "age verification measures, as described above, allows predators to lie about their ages and masquerade as children, with obvious dangers to the actual children on Meta's products."[118]

132.    The default setting for Instagram users' profiles allows posts to be publicly viewed by any user, allowing predators to discover and connect with adolescent users. Instagram knew of sexual predators and considered making teenage users' profiles private by default around July 2020, yet after considering "safety, privacy, and policy wins" against "growth impact" decided to hold off on transitioning to private profiles for users under 16 until July 2021. This left millions of minors exposed to predation and at risk of extortion and abuse. [119]

133.    Instagram's clear lack of regard for the safety of its users is demonstrated through an account which states in the bio line "Hey people hope you decide to follow me I'm 11."[120] This is accompanied by an image of a female who is clearly underage.

---

[117] Shanti Das & Geoff White, Instagram sends paedophiles to accounts of children as young as 11, The Sunday Times (Dec. 1, 2019), https://www.thetimes.co.uk/article/instagram-sendspredators- to-accountsof-children-as-young-as-11-j2gn5hq83.

[118] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).

[119] META3047MDL-003-00028226 at META3047MDL-003-00028226; META3047MDL-003-00013254 at META3047MDL-003-00013254.

[120] Shanti Das & Geoff White, Instagram sends pedophiles to accounts of children as young as 11, The Sunday Times (Dec. 1, 2019), https://www.thetimes.co.uk/article/instagram-sendspredators-to-accounts-of-children-as-young-as-11-j2gn5hq83.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

134.    Other defective features include Instagram's direct messaging features which allow users to (a) send a photo and immediately make it disappear after opening, (b) send messages in "vanish" mode which allows users to have the message disappear after sending and (c) messages may be sent to any user on the platform even without a prior connection. The amalgamation of these features allows predators to reach out to minors with virtually no evidence of what was exchanged.  Further, "[t]his feature enables predators to identify children who are willing to respond to a stranger's message, and then prey on their insecurities."[121]

135.    In June of 2020, a disturbing internal study revealed 500,000 underage Instagram accounts receive inappropriate interactions with children on a daily basis. At this time Instagram's policy was disturbingly nonchalant, calling Child safety a "nongoal."[122]

136.    One-way predators can repeatedly target and harass minors is through Instagram's … to permit users to operate multiple accounts simultaneously with no protections.   By permitting multiple accounts, Meta enables predators to assume multiple fake identities, claiming to be minors themselves to solicit other minors. Instagram is aware of this opportunity being given to predators and has done nothing to stop it.

137.    Another flaw in Meta's products is the location feature, allowing users to geotag their location at that time. Instagram users can use the Explore tool to search for posts based on specific location tags.[123] As discussed before, adolescents and teens are not capable of discerning when it is safe and appropriate to reveal their location. Therefore, geotags are inherently dangerous because teens reveal to predators intimate places like the location of their home and school.

---

[121] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).
[122] META3047MDL-003-00028214 at META3047MDL-003-00028215.
[123] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

Furthermore, predators can search their own area for victims, increasing the risk that adolescent users are targeted for sexual exploitation, sextortion, and CSAM.[124]

138.    In order to skirt around the CSAM reporting requirements, Meta relies on its own definition of CSAM. This more lenient definition doesn't require Meta to report harmful CSAM content as required by law.[125]  Meta's internal CSAM reporting "requirements fail to sufficiently meet the clear requirements provided in 18 U.S.C. § 2256(8) and related case law."[126] An example of the inadequacy of Meta's requirements is Meta's use of the "Tanner Stages, a classification system used to track children's physical development during puberty, to assist with making moderation decisions related to potential CSAM. The scale's creator, Dr. James Tanner, has called this approach "wholly illegitimate."[127]

139.    In a joint letter from the United Kingdom Secretary of State for the Home Department, the United States Attorney General, the United States Secretary of Homeland Security and the Australian Minister for Home Affairs, Zuckerberg was urged "to refrain from implementing dangerous design modifications to his products, "embed the safety of the public in system designs," and "act against illegal content effectively with no reduction to safety," in ways that safeguard victims."[128]

140.    In November of 2021, Meta reported it would postpone certain product design changes, such as encrypting direct messages on Instagram, which would create an increased risk and volume of CSAM within its products. Yet as another example of Meta making baseless claims

---

[124] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).
[125] Michael H. Keller, Adults or Sexually Abused Minors? Getting It Right Vexes Facebook, N.Y. Times (Mar. 31, 2022), https://www.nytimes.com/2022/03/31/business/meta-child-sexualabuse.html.
[126] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).
[127] Michael H. Keller, Adults or Sexually Abused Minors? Getting It Right Vexes Facebook, N.Y. Times (Mar. 31, 2022), https://www.nytimes.com/2022/03/31/business/meta-child-sexualabuse.html.
[128] Letter to Mark Zuckerberg from Department of Justice 2 (October 4, 2019), https://www.justice.gov/opa/press-release/file/1207081/download.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

to the public, in January of 2022, Meta implemented those changes to its Messenger application, increasing risks to vulnerable children and the volume of predators and CSAM without sufficient warning.[129]

141.    Meta repeatedly flaunts its indifference to the CSAM problems. First, Meta has "instructed content moderators for its platforms to 'err on the side of an adult' when they are uncertain about the age of a person in a photo or video, according to a corporate training document."[130] Second, according to an unnamed whistleblower report Meta doesn't track the full scale of the CSAM problems within its products because funding is instead allocated to the company's "return on investment." [131] Third, Meta makes ambiguous and misleading public statements claiming to report child exploitation, when in reality, law enforcement inquiries are often not responded to or significantly delayed, hindering investigations of child sexual exploitation.[132]

142.    Meta has the technology and capabilities to detect, report and take action to prevent sexual grooming, sextortion, and CSAM distribution but chooses not to act.

143.    As a result of Meta's defective product design and its indifference to mitigating harmful errors in their products, "Meta's products are polluted with illegal material that promotes and facilitates the sexual exploitation of minors. Meta benefits from increased user activity (and increased advertising revenue) for disseminating these materials on its products."[133]

---

[129] Timothy Buck, Express Yourself in Messenger's End-to-End Encrypted Chats, Messenger News (Jan. 27, 2022), https://messengernews.fb.com/2022/01/27/express-yourself-in-messengersend- to-end-encrypted-chats/.
[130] Michael H. Keller, Adults or Sexually Abused Minors? Getting It Right Vexes Facebook, N.Y. Times (Mar. 31, 2022), https://www.nytimes.com/2022/03/31/business/meta-child-sexualabuse.html.
[131] Angus Crawford, Whistleblower: Facebook's response to child abuse 'inadequate', BBC News, (Oct. 28, 2021) https://www.bbc.com/news/technology-59063768.
[132] See Michael H. Keller & Gabriel J. X Dance, The Internet Is Overrun With Images Of Child Sexual Abuse. What Went Wrong?, N.Y. Times (Sept. 29, 2019), https://www.nytimes.com/interactive/2019/09/28/us/child-sex-abuse.html (describing the proliferation of CSAM on social media apps and the way the apps have hampered law enforcement investigations).
[133] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).

144.    In January of 2023, the FBI partnered with Homeland Security and the National Center for Missing and Exploited Children to issue "a national public safety alert regarding an explosion in incidents of children and teens being coerced into sending explicit images online and extorted for addition explicit material or money."[134] In the last year there have been over 3,000 minors who were victims of sextortion, primarily boys, and over a dozen ended in suicide.[135]

145.    Meta knows that its products are used for the production, possession, distribution, receipt, transportation, and dissemination of millions of materials that depict obscene visual representations of the sexual abuse of children each year. Meta also knows that its defective algorithms worsen the problem: "CEI (Child Expolitative [sic] Imagery) is . . . something people seek out, and our recommendations can make worse."[136]

146.    Meta knowingly fails to take adequate and readily available measures to remove these contraband materials from its products in a timely fashion.

147.    In violation of 18 U.S.C. § 2258A, Meta knowingly fails to report massive amounts of material in violation of 18 U.S.C. § 2256 and 18 U.S.C. § 1466A.

148.    Meta knows, or should have known, that its products are increasingly unsafe for children each year, and yet fails to implement safeguards to prevent children from accessing its products. Meta's products inhibit identification and reporting of CSAM through not allowing a person to report such content unless they sign up with the product and provide personal

---

[134] FBI and Partners Issue National Public Safety Alert on Sextortion Schemes, United States Attorney's Office Southern District of Indiana, (January 19, 2023) https://www.justice.gov/usao-sdin/pr/fbi-and-partners-issue-national-public-safety-alert-sextortion-schemes.
[135] FBI and Partners Issue National Public Safety Alert on Sextortion Schemes, United States Attorney's Office Southern District of Indiana, (January 19, 2023) https://www.justice.gov/usao-sdin/pr/fbi-and-partners-issue-national-public-safety-alert-sextortion-schemes.
[136] META3047MDL-003-00068860 at META3047MDL-003-00068861.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

information.[137] Further, Instagram nor Facebook allows users to report dangerous images or videos directly from the messaging feature, even though this is the main avenue for predators to contact victims.[138]

149.    Upon information and belief, Meta paused or completely stopped certain proactive scanning measures related to child exploitation imagery and CSAM for some unknown period(s), including a period within the past three years.[139]

150.    Meta is capable of incorporating design modifications to protect children but deliberately and willfully fails to do so. One example is the ability to immediately disable to delete harmful content to minors, but Meta has not incorporated this modification. Instead, Meta allowed the sexualization and exploitation of minors on their products to brazenly continue.

151.    Meta has failed to implement adequate CSAM prevention measures and failed to limit the spread of CSAM using its own technology.[140]

152.    Meta knowingly failed to design its products to proactively detect harmful interactions between adults and minors despite having the technology and capabilities to do so successfully.[141]

153.    Collectively, these defects enable predators to identify, connect to, and exploit children.[142]

---

[137] Canadian Centre for Child Protection, Reviewing Child Sexual Abuse Material Reporting Functions on Popular Platforms 16, https://protectchildren.ca/pdfs/C3P_ReviewingCSAMMaterialReporting_en.pdf (last accessed December 28, 2022).

[138] Canadian Centre for Child Protection, Reviewing Child Sexual Abuse Material Reporting Functions on Popular Platforms 16, https://protectchildren.ca/pdfs/C3P_ReviewingCSAMMaterialReporting_en.pdf (last accessed December 28, 2022).

[139] META3047MDL-003-00009133 at META3047MDL-003-00009134.

[140] See META3047MDL-003-00012994 at META3047MDL-003-00012995- META3047MDL-003-00012996 (describing Meta's adoption of different CSAM prevention technologies).

[141] Hany Farid, Reining in Online Abuses, 19 Technology and Innovation 593-599 (2018); META3047MDL-003-00009133 at META3047MDL-003-00009134 (describing Meta's pause of certain CSAM prevention work during Covid-19 and CSAM prevention procedures more broadly).

[142] Hany Farid, Reining in Online Abuses, 19 Technology and Innovation 593-599 (2018), https://farid.berkeley.edu/downloads/publications/nai18.pdf.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

**E.  Meta failed to adequately warn Plaintiff about the dangers and harms caused by Instagram or provide instructions regarding safe use.**

154.    Meta has failed to adequately warn adolescent users and parents about the physical and mental health risks posed by Instagram. These risks include a plethora of mental health disorders like compulsive use, addiction, eating disorders, anxiety, depression, insomnia, exacerbated executive dysfunction, sexual exploitation from adult users, suicidal ideation, self-harm, and death.[143]

155.    Meta used psychological and social mechanisms to target and exploit adolescents. Meta's advertising and marketing materials failed to provide sufficient warnings regarding the risks associated with Instagram and Facebook.

156.    From the lack of conspicuous warning labels during the registration process to the disregard for adolescents exhibiting problematic signs of addiction to and compulsive use, Meta fails adolescent users.

157.    Meta encourages and promotes altered and disingenuous, filters and editing tools, without any warning to adolescent users about the effect these doctored images could have on their mental health.

158.    Meta fails to warn of the known risks intrinsic to its products and in addition, fails to provide guidelines instructing adolescents how to be safe while using their products.

159.    These failures of Meta have proximately caused significant harm to the mental and physical well-being of Plaintiffs, in addition to other injuries set forth herein.

## VI.    PLAINTIFF-SPECIFIC ALLEGATIONS

---

[143] META3047MDL (Plaintiffs' Second Amended Master Complaint (Personal Injury)).

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

160.    Plaintiff G.T.G. was a seventeen-year-old boy who was a user of the Meta platform(s).

161.    Shortly after registering to use the Meta platform(s), Plaintiff began consistent and compulsive use of the platform(s).

162.    In July of 2022, a predator and sextortionist targeted G.T.G. on Meta's Platform, Instagram. Through Instagram's defective products the predator created a phoney account, disguising himself as a young woman in college. The predator used photos of this fictitious young woman to convince G.T.G. he was communicating with a woman around his same age. In fact, the predator behind the account was an adult targeting a minor to blackmail and sextort him for money.

163.    Using the Instagram direct message feature, the predator sent G.T.G. nude photographs of this woman and convinced G.T.G to reciprocate with compromising photographs of himself. The predator coerced G.T.G. to send images by using vanishing mode, which scrubs the photographs immediately after the other user reads the message.

164.    Unbeknownst to G.T.G., the experienced predator was prepared with another device to record the images before they disappeared.

165.    The adult predator then used these images to blackmail G.T.G. with threats of circulating the images to G.T.G.'s friends and family if he did not send money. Due to Instagram's defective products, this predator was able to gain access to G.T.G. and through his account access to personal information about his friends, family, and their whereabouts.

166.    Ultimately, the sextortion was too much for G.T.G.'s young and vulnerable brain to handle and as a result G.T.G. took his own life in July of 2022.

167.    As if that wasn't bad enough, the predator continued to harass and barrage G.T.G.'s parents and siblings, mocking G.T.G. with complete indifference to this young boy's life. The

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

predator was able to hide behind Instagram's defective products and G.T.G.'s family was left with no recourse.

168.    This predator is out there today active on Instagram, hiding behind Meta's defective products and posing as a young woman, exploiting young boys for money.

169.    As a proximate result of his use of the Meta platform(s), and specifically due to the recommendations and content Defendants selected and showed to G.T.G., the lack of protective controls by Defendant, and the lack of protections surrounding creation of fake spam accounts, a minor user of the Meta platform(s), subsequently developed injuries, including but not limited to, suicide.

170.    Defendants have designed the Meta platform(s), including through the use of appearing or time-sensitive messaging features, to frustrate parents like Brandon Guffey from exercising their rights and duties as parents to monitor use of the app and enables spam accounts to send explicit messages to minors without a way to track the messages back to them using Vanish mode.

171.    Defendants have designed their Meta platforms(s) to allow minors to use their products without protection from known predators.

172.    Meta has intentionally and deliberately targeted adolescents, designed the platforms to be attractive nuisances to underage users and failed to exercise the ordinary care owed to underage business invitees to prevent foreseeable and detrimental impact on minor users that access the platform(s).

173.    Brandon Guffey was not aware of the addictive and mentally harmful effects of the Meta platform when G.T.G. began using the products.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

174.     Defendants failed to warn G.T.G. and Brandon Guffey of the dangers of adult predators targeting teenagers for sexual exploitation, sextortion, and CSAM on Meta platform(s), that its usage could increase risky and uninhibited behavior in adolescents making them easier targets for sexual exploitation, sextortion, and CSAM by adult predators, Defendants knowingly misrepresented the safety of their products.

175.     As a result of G.T.G.'s use of Meta platform(s), he lost his life and his family struggles with this loss every day.

## VII.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### STRICT LIABILITY – DESIGN DEFECT
#### (Against All Defendants)

176.     Plaintiff realleges and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

177.     At all relevant times, each Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from its products used by Plaintiff.

178.     Each of the Defendant's respective products are designed and intended to be social media products.

179.     Each of the Defendant's respective products are distributed and sold to the public through retail channels (i.e., the Apple App "Store" and the Google Play "Store").

180.     Each of the Defendant's respective products are marketed and advertised to the public for the personal use of the end-user / consumer.

181.     Each of the Defendant's defectively designed its respective products to addict minors and young adults, who were particularly unable to appreciate the risks posed by the products, and particularly susceptible to harm from those products.

182.     The defects in the design of each of the Defendant's respective products existed prior to the release of these products to Plaintiff and the public, and there was no substantial change to any of the Defendants' products between the time of their upload by each Defendant to public

or retail channels (e.g., the App Store or Google Play) and the time of their distribution to Plaintiff via download or URL access.

183.    Plaintiff used these products as intended, and each Defendant knew or, by the exercise of reasonable care, should have known that Plaintiff would use these products without inspection for its addictive nature.

184.    Each Defendant defectively designed its respective products to take advantage of the chemical reward system of users' brains (especially young users) to create addictive engagement, compulsive use, and additional mental and physical harms.

185.    Each Defendant failed to test the safety of the features it developed and implemented for use on its respective products. When each Defendant did perform some product testing and had knowledge of ongoing harm to Plaintiff, it failed to adequately remedy its respective product's defects or warn Plaintiff.

186.    Each of the Defendant's respective products are defective in design and pose a substantial likelihood of harm for the reasons set forth herein, because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the products are less safe than an ordinary consumer would expect when used in such a manner. Children and teenagers are among the ordinary consumers of each of the Defendant's products. Indeed, each Defendant markets, promotes, and advertises its respective products to pre-teen and young consumers. Pre-teen and young consumers, and their parents and guardians, do not expect Defendants' products to be psychologically and neurologically addictive when the products are used in its intended manner by its intended audience. They do not expect the algorithms and other features embedded by each Defendant in its respective products to make them initially and progressively more stimulative, to maximize young consumers' usage time. They do not expect each Defendant's revenues and profits to be directly tied to the strength of this addictive mechanism and dependent on young consumers spending several hours a day using their respective products.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

187.    Each of the Defendant's respective products are likewise defectively designed in that it creates an inherent risk of danger; specifically, a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include but are not limited to dissociative behavior, withdrawal symptoms, social isolation, damage to body image and self- worth, increased risky behavior, exposure to predators, sexual exploitation, and profound mental health issues for young consumers including but not limited to depression, body dysmorphia, anxiety, suicidal ideation, self-harm, insomnia, eating disorders, death, and other harmful effects.

188.    The risks inherent in the design of each of the Defendant's respective products significantly outweigh any benefit of such design.

189.    Each of the Defendants could have utilized cost-effective, reasonably feasible alternative designs including algorithmic changes and changes to the addictive features described above, to minimize the harms described herein, including, but not limited to:

(1)    Robust age verification; Effective parental controls;

(2)    Effective parental notifications;

(3)    Warning of health effects of use and extended use upon sign-up;

(4)    Default protective limits to the length and frequency of sessions;

(5)    Opt-in restrictions to the length and frequency of sessions;

(6)    Self-limiting tools, including but not limited to session time notifications, warnings, or reports;

(7)    Blocks to use during certain times of day (such as during school hours or late at night);

(8)    Beginning and end to a user's "Feed;"

(9)    Redesigning algorithms to limit rather than promote addictive engagement;

(10)    Implementing labels on images and videos that have been edited through product features such as "filters;"

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

(11)  Limits on the strategic timing and clustering of notifications to lure back users;

(12)  Removing barriers to the deactivation and deletion of accounts;

(13)  Designing products that did not include the defective features listed in this Complaint while still fulfilling the social networking purposes of a social media product;

(14)  Implementing freely available and industry-proven child protection API tools such as Project Arachnid Shield to help limit and prevent child sexual exploitation, sextortion, and distribution of known CSAM through their products;

(15)  Implementing reporting protocols to allow users or visitors of Defendants' products to report CSAM and adult predator accounts specifically without the need to create or log in to the products prior to reporting;

(16)  Implementing the legal definition of CSAM under 18 U.S.C. § 2256(8) and related case law when scanning for CSAM using tools such as PhotoDNA and CSAI to prevent underreporting of known CSAM;

(17)  Prioritizing "tolerance" rather than "efficiency" and "distinctness" of the detection model when using scanning tools such as PhotoDNA and CSAI to prevent underreporting of known CSAM;

(18)  Implementing client-side scanning and hashing and/or secure enclaves in the direct messaging features of Meta's, Snap's, and ByteDance's products, to prevent underreporting of known CSAM, and implementing proactive detection measures to scan for known CSAM within all Defendants' social media products and remove it;

(19)  Limiting or eliminating the use of geolocating for minors;

(20)  Eliminating product features that recommend minor accounts to adult strangers; and

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

(21)    Others as set forth herein.

190.    Alternative designs were available that would reduce minors' addictive and compulsive engagement with each of the Defendants' respective products, and which would have served effectively the same purpose of Defendants' products while reducing the gravity and severity of danger posed by those products' defects.

191.    Plaintiff used Defendants' respective products as intended or in reasonably foreseeable ways.

192.    The physical, emotional, and economic injuries of Plaintiff were reasonably foreseeable to each of the Defendants at the time of their respective products' development, design, advertising, marketing, promotion, and distribution.

193.    Defendants' respective products were defective and unreasonably dangerous when they left the Defendants' respective possession and control. The defects continued to exist through the products' distribution to and use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

194.    Plaintiff was injured as a direct and proximate result of each of the Defendant's respective defective designs as described herein. The defective design of the products used by Plaintiff was a substantial factor in causing harm to Plaintiff.

195.    As a direct and proximate result of Defendants' respective products' defective design, Plaintiff suffered serious and dangerous injuries.

196.    The injuries of Plaintiff cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

197.    The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' respective products. Many Plaintiffs are continuing to use Defendants' respective products. When Plaintiffs use Defendants' respective products, they will not be independently able to verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

198.    The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to punish each Defendant and deter others from like conduct.

199.    Plaintiff demands judgment against each Defendant for injunctive relief and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY – FAILURE TO WARN
### (Against All Defendants)

200.    Plaintiff reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

201.    At all relevant times, each of the Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from its respective products used by Plaintiff.

202.    Plaintiff was a foreseeable user of Defendants' respective products.

203.    Defendants' respective products are distributed and sold to the public through retail channels (e.g., the Apple App "Store" and the Google Play "Store").

204.    Each of the Defendants sold and distributed its respective products to Plaintiff in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to youth as described herein, including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include but are not limited to dissociative behavior, withdrawal symptoms, social isolation, damage to body image and self-worth, increased risky behavior, exposure to predators, sexual exploitation, and profound mental health issues for

55

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

young consumers including but not limited to depression, body dysmorphia, anxiety, suicidal ideation, self-harm, insomnia, eating disorders, death, and other harmful effects.

205.    Each of the Defendant's respective products is dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' products, because they encourage unhealthy, addictive engagement and compulsive use.

206.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth considering its own internal data and knowledge regarding its products at the time of development, design, marketing, promotion, advertising, and distribution.

207.    Defendants' respective products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to inform users that, among other things:

(1) Defendants' respective products cause addiction, compulsive use, and/or other concomitant physical and mental injuries;

(2) Defendants' respective products harvest and utilize user data in such a way that increases a user's risk of addiction to these products and concomitant physical and mental injuries;

(3) The algorithmically targeted feeds in Defendants' respective products are designed to promote increasingly stimulative and alarming content to encourage compulsive engagement by the user, raising the risk of mental health harms including but not limited to depression, self-harm, and eating disorders;

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

(4) Defendants' respective products include features such as appearance-altering "filters" that are known to promote negative social comparison, body dysmorphia, and related injuries among youth by promoting artificial and unrealistic beauty standards;

(5) New users of Defendants' respective products can identify themselves as minors, begin to use the product, and do so indefinitely, without any time or usage limitations, without ever receiving a safety warning, and without ever having to provide information so that each Defendant can warn the users' parents or guardians;

(6) The likelihood and severity of harms is greater for minors and young adults; The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another, and by algorithms and other source code design that is currently publicly unknown and hidden from the users and the government;

(7) Sexual predators use Defendants' respective products to produce and distribute CSAM;

(8) Adult predators target young children for sexual exploitation, sextortion, and CSAM on Defendants' respective products, with alarming frequency; Usage of Defendants' respective products can increase the risk that children are targeted and sexually exploited by adult predators;

(9) Usage of Defendants' respective products can increase risky and uninhibited behavior in children, making them easier targets to adult predators for sexual exploitation, sextortion, and CSAM; and

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

(10)    End-to-end encryption and/or the ephemeral nature of Direct Messaging on

the Meta, ByteDance, and Snap products prevent the reporting of CSAM.

208.    Ordinary users would not have recognized the potential risks of Defendants'

respective products when used in a manner reasonably foreseeable to each of the Defendants.

209.    Had Plaintiff received proper or adequate warnings or instructions as to the risks

of using Defendants' respective products, Plaintiff would have heeded the warnings and/or

instructions.

210.    Each of the Defendant's failures to adequately warn Plaintiff about the risks of its

defective products was a proximate cause and a substantial factor in the injuries sustained by

Plaintiff.

211.    The injuries of Plaintiff cannot be wholly remedied by monetary relief and such

remedies at law are inadequate.

212.    The nature of the fraudulent and unlawful acts that created safety concerns for

Plaintiff are not the type of risks that are immediately apparent from using Defendants' respective

products. Many Plaintiffs are continuing to use Defendants' respective products. When Plaintiffs

use Defendants' respective products, they will not be independently able to verify whether

Defendants' respective products continue to pose an unreasonable risk or rely on Defendants'

respective representations in the future.

213.    The conduct of each Defendant, as described above, was intentional, fraudulent,

willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and

displayed an entire want of care and a conscious and depraved indifference to the consequences of

its conduct, including to the health, safety, and welfare of their customers, and warrants an award

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

of punitive damages in an amount sufficient to punish each Defendant and deter others from like conduct.

214.     Plaintiff demands judgment against each Defendant for injunctive relief and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRD CAUSE OF ACTION
### Products Liability – Negligent Design
### (Against All Defendants)

215.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

216.     At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from its respective products used by Plaintiff.

217.     Facebook and Instagram were designed and intended to be used as social media platforms.

218.     Defendants knew or, by the exercise of reasonable care, should have known, that its respective products were dangerous, harmful, and injurious when used by youth in a reasonably foreseeable manner.

219.     Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendants' own internal data and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to Plaintiff.

220.     Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of the Defendants' respective products. Those risks include abuse, addiction, and compulsive use in

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, damage to body image and self-worth, increased risky behavior, exposure to predators, sexual exploitation, and profound mental health issues including but not limited to depression, body dysmorphia, anxiety, suicidal ideation, self-harm, insomnia, eating disorders, and death.

221.     Defendants owed a duty to all reasonably foreseeable users to design a safe product.

222.     Defendants breached its respective duty by designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

223.     Defendants breached their duty by failing to use reasonable care in the design of Facebook and Instagram because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

224.     Each Defendant breached its respective duty by failing to use reasonable care to use cost-effective, reasonably feasible alternative designs, including algorithmic changes and changes to the addictive features described above, and other safety measures, to minimize the harms described herein. Alternative designs that would reduce the addictive features of Defendants' respective products were available, would have served effectively the same purpose as each of the Defendants' defectively designed products, and would have reduced the gravity and severity of danger Defendants' respective products posed minor Plaintiff.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

225.     A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

226.     At all relevant times, Plaintiff used Defendants' respective products in the manner in which they were intended by Defendants to be used.

227.     As a direct and proximate result of each of the Defendants' breached duties, Plaintiff was harmed. Defendants' design of their respective products was a substantial factor in causing the Plaintiff's harm and injuries.

228.     The injuries of Plaintiff cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

229.     The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' respective products. Many Plaintiffs are continuing to use Defendants' respective products. When Plaintiffs use Defendants' respective products, they will not be independently able to verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

230.     The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to punish each Defendant and deter others from like conduct.

231.     Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FOURTH CAUSE OF ACTION**
**NEGLIGENCE – FAILURE TO WARN**
**(Against All Defendants)**

232.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

233.    At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from its respective products used by Plaintiff.

234.    Plaintiff was a foreseeable user of Defendants' respective products.

235.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth.

236.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, damage to body image and self-worth, and profound mental health issues including but not limited to depression, body dysmorphia, anxiety, suicidal ideation, self-harm, insomnia, eating disorders, and death

237.    Had Plaintiff received proper or adequate warnings about the risks of Defendants' respective products, Plaintiff would have heeded such warnings.

238.    Each of the Defendants knew or, by the exercise of reasonable care, should have known that its products posed risks of harm to youth. These risks were known and knowable in

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

light of each of the Defendant's own internal data and knowledge regarding its products at the time of development, design, marketing, promotion, advertising and distribution to Plaintiff.

239.    Each of the Defendants owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide adequate warnings about the risk of using Defendants' respective products that were known to each of the Defendants, or that each of the Defendants should have known through the exercise of reasonable care.

240.    Each of the Defendants owed a heightened duty of care to minor users and their parents to warn about its products' risks because adolescent brains are not fully developed, resulting in a diminished capacity to make responsible decisions regarding the frequency and intensity of social media usage. Children are also more neurologically vulnerable than adults to the addictive aspects of Defendants' respective products, including but not limited to the "flow state" created by an endless feed and the public social validation created by follows and likes.

241.    Each of the Defendants owe a particularly heightened duty of care to users under the age of 13, whose personal information is accorded special protections under federal law. See 15 U.S.C. § 6501 et seq.

242.    Each Defendant breached its duty by failing to use reasonable care in providing adequate warnings to Plaintiff, as set forth above.

243.    A reasonable company under the same or similar circumstances as Defendants would have used reasonable care to provide adequate warnings to consumers, including the parents of minor users, as described herein.

244.    At all relevant times, each Defendant could have provided adequate warnings to prevent the harm and injuries described herein.

245. As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate warnings, Plaintiff was harmed and sustained the injuries set forth herein. Each of the Defendants' failure to provide adequate and sufficient warnings was a substantial factor in causing the harm to Plaintiff.

246. As a direct and proximate result of each of the Defendants' failure to warn, Plaintiff requires and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

247. The injuries of Plaintiff cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

248. The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' respective products. Many Plaintiffs are continuing to use Defendants' respective products. When Plaintiffs use Defendants' respective products, they will not be independently able to verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

249. The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish each Defendant and deter others from like conduct.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

250.    Plaintiff demands judgment against each Defendant for injunctive relief and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FIFTH CAUSE OF ACTION**
**NEGLIGENCE AND/OR GROSS NEGLIGENCE**
**(Against All Defendants)**

251.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiff realleges and incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein, other than Counts 1-2 (each of which is pled on a product theory). Count 3 is pled in the alternative on a non-product theory.

252.    At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from its respective products used by Plaintiff.

253.    Each Defendant owed Plaintiff a duty to exercise reasonable care in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective platforms not to create an unreasonable risk of harm from and in the use of its platforms (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); to protect Plaintiff from unreasonable risk of injury from and in the use of its platforms; and not to invite, encourage, or facilitate youth, such as Plaintiff, to foreseeably engage in dangerous or risky behavior through, On, or as a reasonably foreseeable result of using its platforms.

254.    Plaintiff was a foreseeable user of the Defendants' respective platform(s).

255.    Each Defendant knew that minors such as Plaintiff would use their respective platform(s).

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

256.    Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of Plaintiff's use of Defendants' respective platform(s).

257.    Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its respective platforms (as developed, set up, managed maintained, supervised, and operated by that Defendant) was dangerous, harmful, and injurious when used by youth such as Plaintiff in a reasonably foreseeable manner.

258.    At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective platforms (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth such as Plaintiff, which risks were known and knowable, including in light of the internal data and knowledge each Defendant had regarding its platforms.

259.    Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users of its respective platforms, such as Plaintiff, would not have realized the potential risks and dangers of using the platform, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited, to dissociative behavior, withdrawal symptoms, social isolation, damage to body image and self-worth, increased risk behavior, exposure to predators, sexual exploitation and profound mental health issues for young consumers including but not limited to depression, body dysmorphia, anxiety, suicidal ideation, self-harm, insomnia, eating disorders, and death.

260.    Each Defendant's conduct was closely connected to Plaintiff's injuries, which were highly certain to occur, as evidenced by the significance of Plaintiff's injuries.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

261.    Each Defendant could have avoided Plaintiff's injuries with minimal cost, including, for example, by not including certain features and algorithms in its respective platforms which harmed Plaintiff.

262.    Imposing a duty on Defendants would benefit the community at large.

263.     Imposing a duty on Defendants would not be burdensome to them because they have the technological and financial means to avoid the risks of harm to Plaintiff.

264.    Each Defendant owed a heightened duty of care to youth users of their respective platforms because the child brain is not fully developed, meaning young people are more neurologically vulnerable than adults to the addictive and other harmful aspects of Defendants' respective platforms, and meaning young people have a diminished capacity to make responsible decisions regarding the frequency, intensity, and manner of their use of Defendants' respective platforms.

265.    Each Defendant owes a particularly heightened duty of care to users under the age of 13 due to the recognized safety risks posed to such users from interactive online platforms, such as Defendants' respective products. See 15 U.S.C. § 6501 et seq.

266.    Each Defendant has breached its duties of care owed to Plaintiff through its affirmative malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective platforms. Those breaches include:

> (1) Including features and algorithms in their respective platforms that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the platform by youth, including Plaintiff;

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

(2) Including features and algorithms in their respective platforms that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including Plaintiff, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, depression, anxiety, suicide and suicidal ideation, body dysmorphia, self-harm, sleep deprivation, insomnia, eating disorders, and death;

(3) Including features and algorithms in their respective platforms that, as described above, are currently structured and operated in a manner that unreasonably exposes youth users to sexual predators and sexual exploitation, including features that recommend or encourage youth users to connect with adult strangers on or through the platform;

(4) Maintaining unreasonably dangerous features and algorithms in their respective platforms after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users;

(5) Facilitating use of their respective platforms by youth under the age of 13, including by adopting protocols that do not ask for or verify the age or identity of users or by adopting ineffective age and identity verification protocols; and

(6) Facilitating unsupervised and/or hidden use of their respective platforms by youth, including by adopting protocols that allow youth users to create multiple and private accounts and by offering features that allow youth users to delete, hide, or mask their usage.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

267. Each Defendant has breached its duties of care owed to Plaintiff through its nonfeasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective platforms. Those breaches include:

(1) Failing to implement effective protocols to block users under the age of 13;

(2) Failing to implement effective parental controls;

(3) Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of platforms by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

(4) Failing to implement reasonably available means to limit or deter use of platforms by youth during ordinary times for school or sleep;

(5) Failing to implement reasonably available means to set up and operate its platforms without algorithms and features, discussed above, that rely on unreasonably dangerous methods (such as endless scroll, autoplay, IVR, social comparison, and others) as a means to engage youth users;

(6) Failing to set up, monitor, and modify the algorithms used on their platforms to prevent the platforms from actively driving youth users into unsafe, distorted, and unhealthy online experiences, including highly sexualized, violent, and predatory environments and environments promoting eating disorders and suicide;

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

(7) Failing to implement reasonably available means to monitor for, report, and prevent the use of their platforms by sexual predators to victimize, abuse, and exploit youth users; and

(8) Failing to provide effective mechanisms for youth users and their parents/guardians to report abuse or misuse of the platforms.

268.    A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its platforms in a manner that is safer for and more protective of youth users like Plaintiff.

269.    At all relevant times, Plaintiff used one or more of the Defendants' respective platforms in the manner in which they were intended to be used.

270.    As a direct and proximate result of each Defendant's breach of one or more of its duties, Plaintiff were harmed. Such harms include addiction to, or compulsive or excessive use of, Defendants' platforms, and cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, damage to body image and self-worth, increased risky behavior, exposure to predators, sexual exploitation and profound mental health issues including but not limited to depression, body dysmorphia, anxiety, suicidal ideation, self-harm, insomnia, eating disorders, and death.

271.    Each Defendant's breach of one or more of its duties was a substantial factor in causing harm and injuries to the Plaintiff.

272.    The injuries of Plaintiff cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

273.    The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' respective

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

products. Many Plaintiffs are continuing to use Defendants' respective products. When Plaintiffs use Defendants' respective products, they will not be independently able to verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

274.    Each Defendant's conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish the Defendants and deter others from like conduct.

275.    Plaintiff demands judgment against each Defendant for injunctive relief and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SIXTH CAUSE OF ACTION
### FRAUDULENT CONCEALMENT AND MISREPRESENTATION
### (Against Meta)

276.    Plaintiff re-alleges and incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

277.    This claim is brought against Meta.

278.    As set forth in more detail above, Meta knew about the defective condition of Instagram and Facebook and that the products posed serious health risks to users.

279.    Meta was under a duty to tell the public the truth and to disclose the defective condition of Instagram and Facebook and that the products posed serious health risks to users, particularly youth.

280.    Meta breached its duty to the public, users, and their parents, including Plaintiff, by concealing, failing to disclose, and making misstatements about the serious safety risks presented by Instagram and Facebook. Even though Meta knew of those risks based on Meta's internal studies, external studies known to Meta, and information conveyed by at least one scientific expert directly to Mark Zuckerberg, it intentionally concealed those findings, in order not to lose users and advertising revenue, and to induce youth, including Plaintiff, to continue using Instagram and Facebook. Worse still, Meta made numerous partial material representations downplaying any potential harm associated with Instagram and Facebook and reassuring the public, Congress, and parents that these products were safe.

281.    By intentionally concealing and failing to disclose defects inherent in the design of Instagram and Facebook, Meta knowingly and recklessly misled the public, users, and their parents, including Plaintiff, into believing these products were safe for children to use.

282.    By intentionally making numerous partial material representations, downplaying any potential harm associated with Instagram and Facebook, and reassuring the public, Congress, and parents, including Plaintiff, that it was safe, Meta fraudulently misled the public, users, and their parents, including Plaintiff, into believing Instagram and Facebook were safe for children to use.

283.    Meta knew that its concealment, misstatements, and omissions were material. A reasonable person, including Plaintiff, would find information that impacted the users' health, safety, and well-being, such as serious adverse health risks associated with the use of Instagram and Facebook, to be important when deciding whether to use, or continue to use, those products.

284.    As a direct and proximate result of Meta's material omissions, misrepresentations, and concealment of material information, Plaintiff were not aware and could not have been aware

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

of the facts that Meta concealed or misstated, and therefore justifiably and reasonably believed that Instagram and Facebook were safe for children to use.

285. As a direct and proximate result of Meta's material omissions, misrepresentations, and concealment of material information, Plaintiff sustained serious injuries and harm.

286. Meta's conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to punish Meta and deter others from like conduct.

287. Plaintiff demands judgment against Meta for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SEVENTH CAUSE OF ACTION
### NEGLIGENT CONCEALMENT AND MISREPRESENTATION
### (Against Meta)

288. Plaintiff realleges and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

289. This claim is brought against Meta.

290. As set forth in more detail above, Meta knew about the defective condition of the Instagram and Facebook products and that the products posed serious health risks to users, particularly youth.

291. Meta was under a duty to tell the public the truth and to disclose the defective design of Instagram and Facebook and that the products posed serious health risks to users.

292.    Meta owed a heightened duty of care to minor users of its products because children's brains are not fully developed, resulting in a diminished capacity to make responsible decisions regarding the frequency and intensity of social media usage. Children are also more neurologically vulnerable than adults to the addictive aspects of Instagram and Facebook, such as the peer approval that comes from amassing follows and likes.

293.    Meta breached its duty to the public, users, and their parents, including Plaintiff, and failed to take reasonable care by concealing, failing to disclose, and making misstatements about the serious safety risks presented by its products. Even though Meta knew of those risks based on Meta's internal studies, external studies known to Meta, and information provided by at least one scientific expert directly to Zuckerberg, Meta negligently concealed those findings, in order not to lose users and advertising revenue, and to induce children, including Plaintiff, to continue using its products. Worse still, Meta negligently made numerous partial material representations downplaying any potential harm associated with its products and reassuring the public and parents its products were safe.

294.    By concealing and failing to disclose, or taking reasonable care to disclose the defects, Meta negligently misled users and their parents, including Plaintiff, into believing Instagram and Facebook were safe for children to use.

295.    By making numerous partial material representations downplaying any potential harm associated with its products and reassuring the public, Congress, and parents, including Plaintiff, that its products were safe, Meta negligently misled the public users and their parents, including Plaintiff, into believing Meta's products were safe for use.

296.    As a direct and proximate result of Meta's material omissions, misrepresentations, and concealment of material information, Plaintiff was not aware and could not have been aware

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

of the facts that Meta concealed or misstated, and therefore justifiably and reasonably believed that Instagram and Facebook were safe for use.

297.     As a direct and proximate result of Meta's material omissions, misrepresentations, and concealment of material information, Plaintiff sustained serious injuries and harm.

298.     Meta's conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish them and deter others from like conduct.

299.     Plaintiff demands judgment a g a i n s t     Meta     for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION
### VIOLATIONS OF 18 U.S.C. §§ 2255 and 2252
### (Against Meta)

300.     Plaintiff re-alleges and incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

301.     Plaintiff brings claims under 18 U.S.C. § 2255 based on each Defendant violation of 18 U.S.C. § 2252 which prohibits the knowing receipt of a visual depiction of Plaintiff engaging in sexually explicit conduct while a minor.

302.     Each Defendant violated the federal child pornography crime found at 18 U.S.C. § 2252(a)(1) which provides that any person commits a federal crime who:

> (1) knowingly transports or ships using any means or facility of interstate or
>
> foreign commerce […] any visual depiction, if—

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

    i.  the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

    ii.  such visual depiction is of such conduct.

303.    Each Defendant also violated the federal child pornography crime found at 18 U.S.C. § 2252(a)(2) which provides that any person commits a federal crime who:

    (1) knowingly receives, or distributes, any visual depiction using any means or facility of interstate or foreign commerce […] or knowingly reproduces any visual depiction for distribution […] if—

    i.  the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

    ii.  such visual depiction is of such conduct.

304.    Plaintiff suffered personal injury as a result of each Defendant's violation of 18 U.S.C. § 2252.

305.    18 U.S.C. § 2255, entitled "Civil Remedy for Personal Injuries," provides that any person who is a victim of a violation of 18 U.S.C. § 2252 and who suffers personal injury as a result of such violation shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000 per victim, and reasonable attorney's fees.

306.    Plaintiff intends to prove actual damages as a result of each of the Defendants' conduct.

307.    At a minimum, Plaintiff intend to seek statutory liquidated damages in the amount of $150,000 against each Defendant, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and post-judgment interest, and such other relief as the Court deems appropriate, pursuant to 18 U.S.C. § 2255(a).

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

308.   Each Defendant's conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish each of the Defendants and deter others from like conduct.

309.   Plaintiff demand judgment against each of Defendants for injunctive and monetary relief, including compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### NINTH CAUSE OF ACTION
### VIOLATIONS OF 18 U.S.C. §§ 2255, and 2252A(5)(b)
### (Against Meta)

310.   Plaintiff re-alleges and incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

311.   Plaintiff brings claims under 18 U.S.C. § 2255 based on each Defendant's violation of 18 U.S.C. § 2252A(a)(5)(B) and each Defendant's knowing receipt of a visual depiction of Plaintiff while minors in violation of 18 U.S.C. § 2256.

312.   Each Defendant violated the federal child pornography crime found at 18 U.S.C. § 2252A(a)(5)(B) which provides that any person commits a federal crime who:

> knowingly possesses, or knowingly accesses with intent to view, any … material that contains an image of child pornography that has been mailed or shipped or transported using any means or facility of interstate or foreign commerce … or that was produced using materials … affecting interstate or foreign commerce by any means, including by computer.

313.   Plaintiff suffered personal injury because of each Defendant's violation of 18 U.S.C. § 2252A(a)(5)(B).

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

314.    18 U.S.C. § 2252A(f)(2), entitled "Relief" provides that the court may appropriate relief, including "temporary, preliminary, or permanent injunctive relief;" as well as "compensatory and punitive damages; and the costs of the civil action and reasonable fees for attorneys and expert witnesses."

315.    18 U.S.C. § 2255, entitled "Civil Remedy for Personal Injuries," provides that any person who is a victim of a violation of 18 U.S.C. § 2252 and who suffers personal injury as a result of such violation shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000 per victim, and reasonable attorney's fees.

316.    Plaintiff intends to prove actual damages as a result of each of the Defendants' conduct.

317.    At minimum, Plaintiff intend to seek statutory liquidated damages in the amount of $150,000 against each Defendant, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and post-judgment interest, and such other relief as the Court deems appropriate, pursuant to both 18 U.S.C. §§ 2255(a) and 2252A(f).

318.    Each Defendant's conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish each of the Defendants and deter others from like conduct.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

319.    Plaintiff demands judgment against each of the Defendants for injunctive and monetary relief, including compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TENTH CAUSE OF ACTION
## WRONGFUL DEATH
### (Against All Defendants)

320.    Plaintiff re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

321.    This Cause of Action is asserted by and on behalf of Plaintiff bringing their actions as heirs of Decedents or as duly appointed representatives of the estates of Decedents pursuant to the laws of various states.

322.    As a direct and proximate result of the conduct of each of the Defendants and the defective nature of its respective social media products as outlined above, Decedents suffered wrongful death, and Plaintiff suing as heirs or estate representatives of Decedents seek damages therefor, including loss of financial support, loss of society, funeral expenses, and estate administration expenses as permitted under various states' laws, and where applicable punitive damages.

323.    Plaintiff demand judgment against each of the Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, as permitted under various states' laws and all such other relief as the Court deems proper.

## ELEVENTH CAUSE OF ACTION
## SURVIVAL ACTION
### (Against All Defendants)

324.    Plaintiff re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228

325. This Cause of Action is asserted by and on behalf of heirs of Decedents or the duly-appointed representatives of the estates of Decedents, pursuant to the laws of various states.

326. As a direct and proximate result of the conduct of each of the Defendants and the defective nature of its respective social media products as outlined above, Decedents suffered bodily injury resulting in pre-death pain and suffering, disability, disfigurement, mental anguish, emotional distress, loss of capacity of the enjoyment of life, a shortened life expectancy, expenses for hospitalizations and other medical and nursing treatments, loss of earnings, and loss of ability to earn. Plaintiff suing as heirs or estate representatives seek damages for these injuries to their respective Decedents as permitted under various states' laws, including where applicable punitive damages.

327. Plaintiff demands judgment against each of the Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, as permitted under various states' law, and all such other relief as the Court deems proper.

## VIII.    <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues so triable.

## IX.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff individually, and in his fiduciary capacity as the personal representative of the Estate of G.T.G, prays for judgment against Defendants, jointly and severally, for actual, consequential and punitive damages, for costs associated with this action, and for such other relief in law or equity as this court deems just and proper.

Respectfully Submitted this 22nd day of January 2024.

STROM LAW FIRM, LLC

s/ John R. Alphin
John R. Alphin, (S.C. Bar No. 72583)
Jessica L. Fickling, (S.C. Bar No. 11403)
Kennedy Ezekiel, (S.C. Bar No. 106318)
6923 N. Trenholm Road, Ste 200
Columbia South Carolina, 29206
TEL: (803) 252-4800
FAC: (803) 252-4801
jfickling@stromlaw.com
jalphin@stromlaw.com
kezekiel@stromlaw.com


Thomas E. Pope
Elrod Pope
212 E. black St.
Rock Hill, SC 29730
TEL: 803-902-7065
tpope@elrodpope.com

*Attorneys for Plaintiff*

ELECTRONICALLY FILED - 2024 Jan 22 5:08 PM - YORK - COMMON PLEAS - CASE#2024CP4600228